**1812.**            CONWAY'S EXECUTORS AND DEVISEES
March  7th.                        *v.*
                      ALEXANDER.

---

*Present....All the Judges.*

If A, advance   THIS was an appeal from the Circuit Court for the
money to B,
and B, there-  district of Columbia, sitting in chancery, at Alexandria.

Walter S. Alexander, the Appellee, son and residuary devisee of Robert Alexander, deceased, filed his bill in equity against the executors and devise s of Richard Conway, deceased, to be permitted to redeem a certain tract of land which his father, Robert Alexander, had, in the year 1788, conveyed to certain trustees, by a deed which the Complainant contended was a mortgage; which land the trustees had conveyed to W. Lyles, who had conveyed the same to the said Richard Conway. The deed was by indenture, dated March 20, 1788, between Robert Alexander of the first part, W. Lyles of the second part, and certain trustees of the third part, whereby Robert Alexander, (after reciting his title to an undivided moiety of 400 acres of land, holden in common with Charles Alexander,) in consideration of 800l. paid to him by W. Lyles, and in consideration of the covenants to be performed by the trustees, bargained, granted and sold, aliened and confirmed to W. Lyles, in fee, *twenty* acres, being part of the said undivided moiety—and to the trustees the residue of the moiety, except part thereof conveyed to B. Dade on the 1st of January, 1788; which residue was supposed to contain 140 acres. To HAVE and to HOLD the 20 acres to W. Lyles, his heirs and assigns, to his and their use forever—and the said residue of the said moiety to the trustees and the majority of them, and the survivors and survivor of them, *in trust as follows,* to wit : " To convey the said residue of the said moiety, " except as before excepted, unto him the said W. Lyles, " his heirs and assigns forever, by good and sufficient " deeds in law for that purpose, *at any reasonable time* " *after the first day of July, which shall be in the year one* " *thousand, seven hundred and ninety, unless the said* " *Robert Alexander, his heirs, executors or administra-* " *tors, shall pay, or cause to be paid to the said W. Lyles,* " *his heirs, executors or administrators, the sum of* 700l. " *current money of Virginia, in gold or silver coin, with* " *lawful interest thereupon, from the date hereof, on or* " *before the first day of July, which shall be in the year* " *of our Lord seventeen hundred and ninety.* And if the " said Robert Alexander, his heirs, executors, or ad " ministrators, shall pay, or cause to be paid to the " said W. Lyles, his heirs, executors or administra- " tors, the said sum of 700l. current money of Virgi- " nia, in gold or silver coin, with lawful interest there-

CONWAY'S EX'RS.

*v.*

ALEXANDER.

upon convey- land to trustees in trust, to convey the same to A, in fee, in case B should fail to repay the money and interest on a certain day—and if B, fail to repay the money on the day limited; and thereupon the trustees convey the land to A.— B, has no equity of redemption.

CONWAY's
EX'RS.
*v.*
ALEXAN-
DER.

"upon, at any time on or before the said first day of
"July, which shall be in the year 1790, in trust, im-
"mediately upon the payment being made, to reconvey
"to him the said Robert Alexander and his heirs for-
"ever, by good and sufficient deeds in law, all the title
"which by virtue of these presents passeth to them the
"said" (trustees) "or any of them, of, in and to the
"said residue of the said moiety, except as before ex-
"cepted, herein before granted and confirmed unto
"them." Robert Alexander then covenants that he
has good title in fee simple to the land conveyed; and
that the 20 acres shall be laid off in a certain situation
contiguous to other land of Lyles, and by certain
metes and bounds therein described. The trustees then
covenant, that they will well and truly execute the
trusts reposed in them, by reconveying the land, to
Robert Alexander, if he should pay the money and in-
terest on or before the 1st of July, 1790—or by con-
veying it to Lyles, if Robert Alexander should not pay
it by that day. Robert Alexander then covenants with
Lyles, that he will make further assurance, &c. both as
to the 20 acres, and as to the residue of the moiety, if
the trustees should convey it to him. He then cove-
nants to warrant *the 20 acres* to Lyles against the
claims and demands of *all persons whomsoever.* This
deed did not contain any covenant on the part of Alex-
ander to pay the 700*l.*

On the 19th of July, 1790, the trustees, by deed of
that date, reciting the deed of the 20th of March, 1788,
and that Lyles had represented that R. Alexander had
not paid the money, and had required them to execute
the trust, conveyed the residue of the undivided moiety
in fee to Lyles, in consideration of the covenants, agree-
ments, and trusts in the former deed contained on their
part to be performed, and in consideration of 700*l.*
mentioned in the said former deed to have been paid by
Lyles to Alexander.

On the 23d of August, 1790, Lyles by deed of that
date, (after reciting the title of Robert Alexander to the
undivided moiety of the 400 acres of land, and his
deed of the 20th of March, 1788, to Lyles and the
trustees, and that Alexander failed to pay the 700*l.* on
the 1st of July, 1790, and that the trustees, by their

deed of the 19th of July, 1790, had conveyed the land in question to Lyles) in consideration of 900*l.* paid him by Richard Conway, conveyed the 20 acres, and the residue of the undivided moiety of the 400 acres, and all his *right, title, interest, use, trust, property, claim, and demand,* in and to the same, *by force of the said indenture, and all deeds, evidences and writings in any manner or way touching the same, and the right and privilege of prosecuting in the name of Lyles,* (if at any time judged necessary by Conway, his heirs or assigns,) *any actions at law for the breach of any of the covenants in the said indenture contained :* To have and to hold all and singular the premises thereby granted, with the appurtenances, and all the estate, right, title, use, trust, interest, property, *claim and demand of him the said W. Lyles thereto, by force and virtue of the aforesaid indentures* to Conway, his heirs and assigns, to his and their use forever ; with a special warranty against the claims of Lyles and his heirs and assigns only.

On the 17th of January, 1793, Robert Alexander made his will, and after devising specifically a number of tracts of land and moieties of tracts by name and description, to his son Robert, devised all the rest and residue of his estate, real and personal, to his son Walter, the Complainant. Robert Alexander, the testator, died in February, 1793. The land in question was not specifically devised by his will, and Walter, the Complainant, obtained title under the will to several other tracts not specifically devised.

The Complainant became of full age in November, 1803, and brought this suit in 1807.

The deposition of W. Lyles was taken on the part of the Defendants. He testified, that Robert Alexander was not indebted to him at the time of the contract for the land. No part of the money was advanced by him as a loan to be secured by mortgage. He was no lender of money, and would not have lent Alexander the money on mortgage. Alexander was generally reputed not punctual in paying his debts, and rather too fond of law, and at the time of the contract for the land was confined in jail for a large debt, and sent several times to Lyles, and urged him buy the land. Lyles then

CONWAY'S resided on land adjoining the 20 acres; and his house
EX'RS. was very near the line. He wanted the addition of
v. about 20 acres, and was not anxious to have any more.
ALEXAN- Alexander was more willing to sell his whole residue of
DER. the moiety of 400 acres, than to sell a part, his object
being to raise a considerable sum to pay the debt for
which he was in prison. It was agreed that the 20 acres
should be sold absolutely, and the residue should be sold
conditionally, as otherwise Lyles would not advance
the money. The 20 acres were purchased *absolutely*,
to suit the convenience of Lyles, and the residue was
purchased *conditionally, to suit Alexander*. Lyles was
determined to advance no money on any bargain which
should make it necessary to go into court to get it back.
The condition was understood by both to be, that if he
paid the money by the time limited, the trustees were to
reconvey the land to Alexander, but otherwise they were
to convey it to Lyles in fee simple, and he was to have
the land thereafter absolutely to his own use forever.
He sold it as soon as he could after he left Alexandria,
*to get back his money*. He received from Conway 900*l.*
at the date of the conveyance, or a few days after. Alex-
ander never made any claim upon Lyles for any part of
the land, and never expressed to him any dissatisfac-
tion with the sale, although he saw him frequently af-
terwards. Alexander was not in confinement when the
trustees made their deed to Lyles. No part of the land
was cultivated, and no formal possession delivered.

The deposition of Ch. Lee, Esq. who drew the deeds
of the 20th of March, 1788, and the 19th of July, 1790,
stated that Lyles consulted him about the bargain with
Alexander, and represented that Alexander wanted a
considerable sum of money to pay a debt which was
pressing, and offered to sell some land, *but would not
sell the whole of it absolutely*, but was willing to sell part
of it absolutely, and the residue was to be conveyed to
trustees, in trust, to convey the fee to Lyles, if a cer-
tain sum of money was not paid by a certain day; and
if it was, the trustees were to reconvey to Alexander.
The deponent was asked if such a contract was lawful,
or would be deemed in law only a mortgage; and gave
it as his opinion, that the parties might make such a
contract, and that it could not be considered a mort-
gage. Lyles intimated that if that was not very clear, he

would not have any thing to do in the business. That he would not, on any terms, make a bargain with Alexander, if he should be obliged to go into a Court of Equity about it, which might be the case if there should be a mortgage; that Alexander was well known to be troublesome and fond of law. The deponent was requested to draw such instruments as would place the contract in the state of a conditional purchase of a part of the land, and with this view he drew the writing. He is certain that Lyles consulted him as to the nature and effect of the contract, and did not intend to have a deed in the nature of a mortgage, but of absolute sale of a part, and of a conditional sale of the other part of the land, and such was the deponent's *intention* when he drew the deed. That he afterwards drew a deed of conveyance from the trustees to Lyles, to carry into effect their trust, and delivered it to Lyles to carry to the trustees. Lyles informed him that one of the trustees refused to execute the deed, unless Alexander would signify his consent, and asked whether a verbal consent would not do. The deponent sketched a note in writing for Alexander to sign, signifying his consent, and was afterwards informed that the trustees were satisfied, and did execute the deed, but he does not know whether Alexander gave his consent. Lyles was not easy in his pecuniary affairs, and he never knew him lend a large sum upon mortgage. Alexander was a bad manager of his estate, was generally needy of money, and not punctual in payment of his debts, though his landed estate was lately of great value.

The answer of the executors does not admit the deed to be a mortgage, and states that Conway began to make expensive and permanent improvements on the land in the summer of 1791; that Alexander had an opportunity of seeing part of them, and probably did see them, and made no objection as they believe.

It appeared in evidence that the land had lately been sold for more than 20,000 dollars; but that it was very poor, much broken by gullies and exhausted, when Conway began his improvements. There was also evidence tending to show, that it was then worth more than he gave for it.

The Court below being of opinion, that the deed was

CONWAY'S<br>EX'RS.<br>*v.*<br>ALEXAN-<br>DER.

CONWAY's to be considered as a mortgage, directed an account to
EX'RS.   be taken of the value of the permanent improvements,
 v.      and the original sum advanced by Lyles and interest,
ALEXAN-  and of the rents and profits, which being done, it ap-
DER.     peared that the Complainant would have to pay the sum
———————  of 4,943 dollars to redeem the land ; and the Court ac-
cordingly decreed a release upon the payment of that
sum.

From this decree the Defendants appealed to this
Court.

C. LEE *for the Appellants.*

The only question is, whether this is a case of mort-
gage. The bill does not state fraud or oppression. . 1.
*As to the deed itself,* the question is whether it be a defea-
sable purchase, or a redeemable mortgage.

It sets forth the consideration of 800*l.* as one entire
sum. There was no prior debt due to Lyles. That al-
legation of the bill is disproved ; and unless there was
an old debt, or an actual loan, there could be no mort-
gage. It may as well be a mortgage of the 20 acres, ·
as of the residue. If both contracts were not actual
purchases, the parties would have required different in-
struments. All instruments are to have a reasonable
construction according to the intent of the parties. One
distinguishing mark of a mortgage is a covenant for the
repayment of the money. But this deed contains no
such covenant. It was purposely omitted, that it might
not be a mortgage. The whole question is as to the in-
tention of the parties. Lyles had no *personal* remedy.
If the land should fall in value, it was *his* loss. If there
had been a valuable house upon the land, which had
been destroyed by fire, it would have been the loss of
Lyles. It was not reasonable that Alexander should
have the chance of gain, but not of loss. It was in his
power to compel Lyles to take the land, by neglecting
to pay the money on the day. Another circumstance
showing the intention of the parties is, that Alexander
covenanted to make further assurance, if required,
whenever the trustees should have conveyed the land to
Lyles.

It was not intended as a security for money to Lyles, but a mere right in Alexander to repurchase until a certain day. A Court of Equity cannot change the agreements of parties.

CONWAY's EX'RS.
<br>v.
<br>ALEXAN-
<br>DER.

In the case of *Tasburgh v. Echlin,* 4 *Br. Parl. Ca.* 142. cited in *Powell on Mortgages,* 174. there had been a bill to *foreclose,* which clearly showed the intention of the purchaser to consider it as a mortgage. But the House of Lords decided it to be an irredeemable purchase, and not a mortgage. That was an assignment, by lease and release, of a reversion expectant on a lease for years, of which 43 were yet to come, in consideration of 200*l.* paid by sir *John Eustace* to *Charles Tasburgh,* in trust for *John Tasburgh,* dated in 1681. In the indenture of release, there was a proviso, that if sir *John Eustace* should pay *Charles Tasburgh,* at the end of 5 years, 200*l.* with interest, it should be lawful to him to re-enter and enjoy in his former right; but if he should fail to pay within the time limited, the estate of *Charles* should be absolute as well in equity as in law, and that sir *John* and his heirs should be forever debarred from all right and relief in equity, against the tenor of the said release; and sir *John* did thereby, for himself and his heirs, release to *Charles Tasburgh,* his heirs and assigns forever, all his right in equity to redeem the premises, in case of failure of payment as aforesaid; and there was no covenant in the deed for the repayment of the money, or the interest by the grantor, as is usual in mortgages.

After the 5 years, *John Tasburgh* exhibited a bill, in 1687, against sir *John Eustace,* praying payment at a certain day, or that the conditional estate of *Charles,* (in case it should be adjudged a defeasable or redeemable estate) should be made absolute, and that sir *John* might be foreclosed of all equity of redemption. This bill was taken for confessed, and a decree in December, 1688, that he should be foreclosed, unless payment were made of principal, interest and costs, before December, 1689.

Sir *John* acquiesced under this decree for 18 years, when he died. *John Tasburgh* died in 1691, and *Henry Tasburgh* succeeded to his estate, and in 1722 de-

CONWAY'S
EX'RS.
v.
ALEXAN-
DER.

mised the premises to *M·Namara*. In 1723, the heirs of sir *John Eustace* exhibited a bill, alleging that the decree for foreclosure had been obtained by surprise, fraud and imposition, and praying it might be reviewed and reversed, which was done by the Court of Chancery in Ireland, who decreed that *Henry Tasburgh* should release to the heirs of sir *John*, upon payment of the principal, interest and costs. From this decree *Henry Tasburgh* appealed to the House of Lords, who reversed it and dismissed the bill.

The principal upon which this case was decided by the House of Lords, is supposed by *Powell* to be, that the contract was to be considered as a *conditional purchase*, and not a mortgage.

And in the case of *Barrell v. Sabine*, 1 *Vern.* 268, the *Lord Keeper* said, " he thought, that where there was " a clause or provision to repurchase, the time limited " ought to be precisely observed."

In the case of *Chapman v. Turner*, 1 *Call.* 192. Judge *Pendleton* in delivering his opinion, said, " As on the " one hand the Chancellor will not permit a real mort- " gage to be made irredeemable by the act of the scri- " vener, so neither on the other will he suffer *real* con- " ditional or defeasible sales to be changed into mort- " gages by the like acts. The real intention of the " parties governs him. In a defeasible purchase, the " condition must be strictly performed at the day, or no " relief will be granted; because it does not admit of " compensation for the risk. If the thing perish the " next day, it must be the loss of the purchaser, he " having no covenant, or even implied promise, to re- " turn the money in that event; and we are taught by " a maxim in equity, that in these casual cases, even- " tual loss or gain must accrue to, or fall on him who " runs the risk."

In the present case, both parties confided in the trustees. Their deed, after the failure of Alexander to pay the ready money, was as valid as if he himself had then released all equity of redemption, or had made an an absolute deed to Lyles.

2. *As to the evidence in the case.* It appears that

the trustees refused to execute the deed until they had the consent of Alexander. A writing was drawn for him to sign, signifying his assent. The trustees executed the deed. The probability is, that they had his assent in writing. He knew that the deed had been executed, and he acquiesced. He saw the expensive improvements made by Conway, and he was silent. Conway continued making substantial and permanent improvements for 17 years, without keeping any account either of the cost of his improvements, the expenses of cultivation, or the value of the crops. It has now become impossible to account. Justice cannot now be done. In 2 *Eq. ca. ab.* 599, it is said, that "Equity "will not enlarge the time for the mortgagor to redeem "*after six years acquiescence under a forfeiture by his* "*own consent, especially if there be any improvement on* "*the estate.*" And again, "There shall be no redemp- "tion after *long possession*, settlements made, and *estate* "*improved.*"

In the case of *Hollingsworth v. Frye*, Judge PATER-SON, in delivering his opinion, said, that the time of payment was material, a *cardinal point;* and the party ought not to be suffered to lay by and take the chance of the rise of value.

Lyles's giving a special warranty only, is no evidence that he considered it as a mortgage. The *boundary* was unsettled, and then in a course of litigation, which was a sufficient reason for his not giving a general warranty. And that Alexander did not consider it as a mortgage is evident from the circumstance, that he did not mention this land in his will, although he specified almost every tract of land in which he had any interest, especially that part of this very tract which he had previously contracted to sell to Baldwin Dade.

This deed, therefore, was neither a mortgage *per se,* nor was it the intention or understanding of either of the parties that it should be so considered; but conveyed a good, absolute, and indefeasible estate, both at law and in equity to W. Lyles, and his heirs and assigns.

TAYLOR, *contra.*

Admitted the distinction between an agreement to re-

CONWAY'S EX'RS. *v.* ALEXANDER.

purchase, and a mortgage. But in this case, if it be not a mortgage, it was a most unconscionable bargain. The evidence shows that at the time of the bargain, other land less advantageously situated, and not better in quality, was worth three or four times the price which Lyles paid for this.

As to the question of *mortgage.* " Every contract for " the receiving of money, by the conveyance of a real " estate to the lendor, *not made in contemplation of an eventual arrangement of property,* is, in equity, deemed a *mortgage.*" *Mellor v. Lees,* 2 *Atk.* 495. And all provisoes and stipulations between the parties, tending to alter, in any subsequent event, the original nature of the *mortgaged interest,* or prevent the redemption of the estate pledged, upon payment of the money borrowed, with interest, are void. For were any such agreements suffered to prevail, they would put it in the power of every mortgagee to take advantage of the necessities of the mortgagor, by inserting restrictive clauses to prevent a redemption of the estate pledged, unless upon terms injurious to the latter. In equity, therefore, the right of redemption is considered as inseparably incident to every contract founded on a mortgage, and can no more be restrained than the power of tenant in fee simple to alien generally, or of tenant in tail, to suffer a recovery ; it being a maxim in equity, *that the same estate or interest cannot be a mortgage at one time, and at another time cease to be so.*" *Powell on Mortgages,* 146. Nor will an agreement to make the conveyance absolute upon payment of a further sum, if the money lent be not paid at the day appointed, alter the case ; such stipulations being deemed unconscionable ; because a man ought not to have interest for his money, and a collateral advantage besides ; nor may he clog the redemption by any bye agreement. 1 *Vern.* 488. *Willet v. Winnel. Powell,* 152.

Powell, in concluding his observations upon the case *Tasburgh v. Echlin, p.* 183.—says " But in all these cases where the equity of redemption is rebutted by agreements of this kind, and the transaction is considered as a conditional purchase, the intention of the parties at the time of contracting must, I apprehend, be *clearly proved* or necessarily implied from the circum-

stances attending it; otherwise the *general rule* will not be departed from."

It is not necessary, to constitute a mortgage, that it should contain a covenant for the re-payment of the money. 3. *Atk.* 280, *Lawley v. Hooper*; where the lord Chancellor says that all *Welch* mortgages are without this covenant, and so are most copyhold mortgages. So in case of *King v. King*, 3. *P. Will.* 358, it was decided that every mortgage, although there be no covenant nor bond to pay the money, implies a *loan*, and every loan a *debt*; as in the case of the mortgage of a ship, which was *taken* at sea, although there was no covenant to pay the money, yet the executors of the mortgagor were decreed to pay the money for which the ship was mortgaged. And the lord chancellor said it was so in the case of *Welch mortgages*, where no day certain is appointed for the payment, but the matter left at large. The case of *Howell v. Price*. 1. *P. Will.* 291, was upon a Welsh mortgage, viz: conveyance in fee of an estate in Wales, worth 52*l.* per annum, under a proviso to be void if the mortgagor, his heirs or assigns should pay to the mortgagee or his heirs, 300*l. on any Michaelmas day*, giving six months notice, and the mortgagee to have the rent which should then be in arrear; but there was no bond or covenant to pay the money.— Yet it was decreed that it was a debt which the executors should pay. The case of *Ross v. Norwell*, 1. *Wash.* 14, shows that a covenant to pay is not essential.

A deed of trust is a modern invention by which the equity of redemption is supposed to be foreclosed, without the aid of a Court of Chancery. But the present differs from the modern deed of trust. In that there is a public sale, and the surplus is paid to the mortgagor, which, if the sale is fairly and judiciously made, may be considered as the fair value of his equity of redemption. Yet the efficacy of such a sale as that to pass an irredeemable estate is doubted. *Powell*, 19.—But *here*, the trustees were the mere instruments to convey. They had no powers to do any thing but convey, upon the payment or non-payment of the money. Here was no provision made, to ascertain the value of the equity of redemption, or to mitigate the severity of the contract The intervention of the trustees did not alter the case

CONWAY'S or make it more, or less a mortgage than it would have EX'RS. been without them.

*v.*

ALEXAN-      It is in effect the same as if the deed had been directly
DER.    from Alexander to Lyles, with a proviso that it should
—————— be void if Alexander should pay the money on the day
appointed. Such a deed would unquestionably have
been considered as a mortgage. It has been shewn
above, that a covenant to pay was not necessary; and
a covenant for further assurance is usual in mortgages,
and is therefore no evidence that this conveyance is not
to be considered a mortgagee. If then it is to be
considered as a mortgage upon the face of the instru-
ment; is the extrinsic evidence so clear as to rebut the
equity of redemption?

Why was there a distinction made between the convey-
ance of the 20 acres and that of the 140? Why were the
20 conveyed to Lyles, and the 140 to the trustees? The
answer apparent upon the face of the transaction, and
expressly avowed by Lyles himself in his deposition, is,
that Lyles did not want to purchase, and Alexander
did not want to sell, more than 20 acres. Lyles says
that the 20 acres were conveyed absolutely *to suit his
convenience,* and the residue was conveyed to the trus-
tees to *suit Alexander.* As to the 140 acres then, Lyles
did not wish to purchase them, nor Alexander to sell
them. If a sale and disposition of the land were not
the object of the transaction, it could be nothing but a
*loan of money* by Lyles, and a *security* upon the land by
Alexander. This was evidently the substance of the
negociation. And wherever there is a loan of money
upon the security of land, however, the transaction may
be disguised by the writings, it is substantially a mort-
gage. Lyles indeed admits his object to have been a
loan of money, but says his intention was to have the
means of getting back his money without going into a
Court of Chancery; that is, he wished to loan his money
upon a real security without allowing his debtor the
right of redemption. It was an attempt to do that
which Courts of equity have uniformly discountenan-
ced; to devise a mode to defeat the equity of redemption
where the transaction was really a loan of money upon
a mortgage.

It is said Lyles had no personal remedy against Alexander, because there was no covenant to repay the money. But the authorities already cited show that wherever the transaction is really a loan, and the security is inadequate, there is a personal remedy.

That Lyles considered the land as a *security* only, is evident from the circumstance that he received from Conway only his principal and interest, and *assigned* to Conway *his right and title only, together with the title-papers*, and expressly assigned all his *right of action* against Alexander.

There is no evidence of acquiescence on the part of Robert Alexander, in the idea that this was an absolute sale. He died in January, 1793, Mr. Lyles himself states that he does not know whether Alexander knew of the deed of the 19th July, 1790. Conways agreement with Charles Alexander respecting a division of part of the land which they held in common, was in April, 1791. No improvements could have been made before that date. One of the witnesses states that he began to ditch the land in *March*, 1791. It is probable he meant March, 1792. If so, there were only ten months in which Alexander could have seen any improvement on the land; and what he did see was not inconsistent with the nature of the estate of a mortgagee in fee in possession. The buildings, &c. were not erected until after Alexander's death. The digging of a ditch and erecting of a post and rail fence upon a part of the land was not decisive evidence that Conway claimed an irredeemable estate; and there is no evidence that even that small improvement was seen by Alexander. It is only stated by the witnesses that he might have seen it at a distance as he passed along the road from his house to Alexandria. The Complainant did not become of full age until November, 1803, and brought suit in 1807. His guardian did not know the nature of Conways title. The length of time is no bar to the Complainant because he has been under a legal disability. *Powell*, 407, 8, 11, 12.

It is said that Robert Alexander did not specify this land in his will, although he mentioned that part of the tract which was in the possession of Baldwin Dade—

CONWAY'S and from this circumstance an inference is drawn, that
EX'RS. he considered it as an absolute sale, and not a mortgage.
v. But the reason why he mentioned that part of the land
ALEXAN- which was in possession of B. Dade was, that he devised
DER. it to his son Robert—and it will be perceived by his will,
that he specified every thing by name which he devised
to Robert. but nothing which he devised to Walter, the
Complainant—for after making specific devises to Ro-
bert, he says, "*I give to my son Walter, and his heirs,*
"*forever, all the rest and residue of my estate both real and*
"*personal.*" So that if his not specifying this land be
evidence that he thought he had no interest in it, his not
specifying the half of his estate which he intended for
his son Walter, is evidence that he thought he had no
interest therein.   No such inference can be drawn from
his silence as to this land, which would not apply to one
half of his estate.

There is no evidence of Alexander's understanding of
this transaction.   His circumstances were embarrassed
up to the very time of his death, so that he never had
it in his power to make an offer to redeem.   It is evi-
dent from the deed itself that he expected to be able to
redeem in about two years, from the date of that instru-
ment ; and the insertion of such a clause was evidently
intended for his benefit, and shows that he did not wish
to *sell.*   He was in prison for *debt.*   His object was to
get money to relieve him from confinement ; and the sti-
pulation for a time of payment, is evidence that he
meant to *borrow.*

There is no evidence that this was not a negotiation
for a *loan of money.*   Mr. Lyles, in his deposition, does
not say that the money was not advanced by him *as a
loan ;* but says it was " not advanced as a loan *to be se-
cured by mortgage ;*" and that he would not have loaned
him money " *on any mortgage by him.*"   That he " was
" determined to advance no money on any bargain
" which should make it necessary *to go into court to get it*
" *back.*"   That he sold the land as soon as he could after
he left Virginia, " for the purpose of *getting back his*
" *money.*"   All this shows that he had no objection to
lend the money, but he wished to get real security
without an equity of redemption.   And it appears he
employed counsel to devise a plan for that purpose ; a

purpose which is never countenanced in a Court of CONWAY'S
Equity. EX'RS.

*v.*

The case of *Chapman v. Turner*, which has been cit- ALEXAN-
ed, was a contract respecting *personal* property, and DER.
depended upon its own peculiar circumstances, none of ———————
which resemble the present.

The case of *Tarsburgh v. Echlin*, was a sale or mort-
gage of a *reversion.* There had been a decree of fore-
closure, and a long acquiescence under it. It does not
appear upon what grounds the House of Lords refused
to review that decree; whether it was because it had
been so long acquiesced under, or whether upon the
construction of the original conveyance. But the de-
cision of the Court of Chancery in Ireland was clearly
upon the ground of its being a mortgage.

In the case of *Robertson v. Campbell & Wheeler, 2 Call.*
428, Judge *Pendleton,* in delivering the opinion of the
Court of Appeals of Virginia, says, " It must often
" happen, in disquisitions of this sort, that there will
" be a difficulty in drawing the line between these two
" sorts of conveyances," (mortgage and conditional
sale.) " The great *desideratum,* which this Court has
" made the ground of their decision is, whether the pur-
" pose of the parties was to treat of a *purchase,* the va-
" lue of the commodity contemplated, and the price
" fixed? Or, whether the object was the *loan of money*
" *and a security,* or pledge, for the repayment, intend-
" ed?"

The cases cited from 2 *Eq. ca. ab.* only show, that a
Court of Chancery will not decree a redemption after a
forfeiture by *consent* of the mortgagor, and improve-
ments by the mortgagee, and acquiescence by the mort-
gagor.

Upon the whole, then, this case appears to have been
originally a loan of money upon real security, with an
attempt to defeat the equity of redemption; and not a
real bargain, with a view to the purchase of the land.
The want of a covenant to repay the money, does not
alter the nature of the original transaction, and the
same evidence which appears in this case would have

CONWAY'S
EX'RS.
*v.*
ALEXAN-
DER.

supported a personal action by Lyles against Alexander upon the loan of the money, in case the title of the land had failed, or it had by any other means become an inadequate security.

JONES, *in reply.*

It must be admitted, that it was competent for the parties to make a conditional sale, and the only question is, whether they have done so. The depositions of Mr. Lyles and Mr. Lee show, that it was *their intention* to make a conditional purchase, and not a mortgage. If the instrument does not create a conditional sale, it must have been the mistake of the person who drew the deed.

It is true that no covenant in a *mortgage* can clog the equity of redemption. But if the transaction be not a mortgage, that principle does not apply. Wherever a deed is as *collateral* security, there must be a *personal* remedy. And it is no mortgage, unless it contain a personal obligation, or show it to be a *loan.* In the present deed there is no recital acknowledging a debt, and no covenant to pay ; but the money is expressly acknowledged to be received as *purchase money.* It was entirely within the discretion of Alexander to pay the money or not at the time.

The evidence justifies the inference, that the deed from the trustees to Lyles was made with the consent of Alexander ; and being by consent, it is equivalent to a foreclosure by a Court of Equity. Even if it were a mortgage originally, it might by subsequent assent become absolute. And if at the time of the release of the equity of redemption, a note be given that the releasor should have the lands conveyed to him, *upon payment of what was given for the lands within a year,* such payment having been neglected for several years, there shall be no redemption. *Endsworth v. Griffith. 2 Eq. ca. ab.* 595. c. 6.

In all the cases cited to shew that a covenant to pay the money is not necessary in a mortgage, there is some other circumstance showing a loan of money, or desig

nating the instrument to be a mortgage. But in the present case there is no such circumstance.

*March 14th.....All the Judges being present,*

MARSHALL, *Ch. J.* delivered the opinion of the Court as follows :

This suit was brought by Walter S. Alexander, as devisee of Robert Alexander, to redeem certain lands lying in the neighborhood of Alexandria, which were conveyed by Robert Alexander, in trust, by deed dated the 20th of March, 1788, and which were afterwards conveyed to William Lyles, and by him to the testator of the Plaintiffs in error.

The deed of the 20th of March, 1788, is between Robert Alexander of the first part, William Lyles of the second part, and Robert T. Hooe, Robert Muire and John Allison of the third part. Robert Alexander, after reciting that he was seized of one undivided moiety of 400 acres of land, except 40 acres thereof previously sold to Baldwin Dade, as tenant in common with Charles Alexander, in consideration of eight hundred pounds paid by William Lyles, and of the covenants therein mentioned, grants, bargains and sells twenty acres, part of the said undivided moiety, to William Lyles, his heirs and assigns forever, and the residue thereof, except that which had been previously sold to Baldwin Dade, to the said Robert T. Hooe, Robert Muire and John Allison, in trust, to convey the same to William Lyles at any reasonable time after the first day of July, 1790, unless Robert Alexander shall pay to the said William Lyles, on or before that day, the sum of 700*l.* with interest from the said 20th of March, 1788: And if the said Robert Alexander shall pay the said William Lyles, on or before that day, the said sum of 700*l.* with interest, then to reconvey the same to the said Robert Alexander. Robert Alexander further covenants, that, in the event of a reconveyance to him, the said twenty acres sold absolutely shall be laid off adjoining the tract of land on which William Lyles then lived. The trustees covenant to convey to William Lyles, on the non-payment of the said sum of 700*l.* ; and to re-convey to Robert Alexander in the

CONWAY'S
EX'RS.
*v.*
ALEXAN-
DER.

event of payment.  Robert Alexander covenants for further assurances as to the 140 acres, and warrants the twenty acres to William Lyles and his heirs.

On the 19th of July, 1790, the trustees, by a deed in which the trust is recited, and that Robert Alexander has failed to pay the said sum of 700*l.*, convey the said land in fee to William Lyles.

On the 23d of August, 1790, William Lyles, in consideration of 900*l.*, conveyed the said 20 acres of land and 140 acres of land to Richard Conway with special warranty against himself and his heirs.

On the 9th day of April, in the year 1791, a deed of partial partition was made between Richard Conway and Charles Alexander. This deed shows that Charles Alexander asserted an exclusive title in himself to a considerable part of this land.

Soon after this deed of partition was executed, Richard Conway entered upon a part of the lands assigned to him, and made on them permanent improvements of great value and at considerable expence.

In January or February, 1793, Robert Alexander departed this life, having first made his last will in writing, in which he devises the land sold to Baldwin Dade; but does not mention the land sold to William Lyles.

The Plaintiff, who was then an infant, and who attained his age of twenty-one years in November, 1803, brought his bill to redeem in 1807. He claims under the residuary clause of Robert Alexander's will.

The question to be decided is, whether Robert Alexander, by his deed of March, 1788, made a conditional sale of the property conveyed, by that deed, to trustees, which sale became absolute by the non-payment of 700*l.* with interest on the 1st of July, 1790, and by the conveyance of the 19th of that month, or is to be considered as having only mortgaged the property so conveyed.

To deny the power of two individuals, capable of

acting for themselves, to make a contract for the purchase and sale of lands defeasible by the payment of money at a future day, or, in other words, to make a sale with a reservation to the vendor of a right to repurchase the same land at a fixed price and at a specified time, would be to transfer to the Court of Chancery, in a considerable degree, the guardianship of adults as well as of infants. Such contracts are certainly not prohibited either by the letter or the policy of the law. But the policy of the law does prohibit the conversion of a real mortgage into a sale. And as lenders of money are less under the pressure of circumstances which control the perfect and free exercise of the judgment than borrowers, the effort is frequently made by persons of this description to avail themselves of the advantage of this superiority, in order to obtain inequitable advantages. For this reason the leaning of Courts has been against them, and doubtful cases have generally been decided to be mortgages. But as a conditional sale, if really intended, is valid, the inquiry in every case must be, whether the contract in the specific case is a security for the re-payment of money or an actual sale.

In this case the form of the deed is not, in itself, conclusive either way. The want of a covenant to repay the money is not complete evidence that a conditional sale was intended, but is a circumstance of no inconsiderable importance. If the vendee must be restrained to his principal and interest, that principal and interest ought to be secure. It is, therefore, a necessary ingredient in a mortgage, that the mortgagee should have a remedy against the person of the debtor. If this remedy really exists, its not being reserved in terms will not affect the case. But it must exist in order to justify a construction which overrules the express words of the instrument. Its existence, in this case, is certainly not to be collected from the deed. There is no acknowledgement of a pre-existing debt, nor any covenant for repayment. An action, at law, for the recovery of the money, certainly could not have been sustained; and if, to a bill in chancery praying a sale of the premises, and a decree for so much money as might remain due, Robert Alexander had answered that this was a sale and not a mortgage, clear proof to

*CONWAY'S EX'RS.*

*v.*

*ALEXAN-DER.*

CONWAY'S
EX'RS.
*v.*
ALEXAN-
DER.
———————

the contrary must have been produced to justify a de- cree against him.

That the conveyance is made to trustees is not a cir- cumstance of much weight. It manifests an intention in the drawer of the instrument to avoid the usual forms of a mortgage, and introduces third persons, who are perfect strangers to the transaction, for no other conceivable purpose than to entitle William Lyles to a conveyance subsequent to the non-payment of the 700*l.*, on the day fixed for its payment, which should be absolute in its form. This intention, however, would have no influence on the case, if the instrument was really a security for money advanced and to be repaid.

It is also a circumstance which, though light, is not to be entirely disregarded, that the 20 acres, which were admitted to be purchased absolutely, were not di- vided and conveyed separately. It would seem as if the parties considered it as at least possible that a divi- sion might be useless.

Having made these observations on the deed itself, the Court will proceed to examine those extrinsic cir- cumstances which are to determine whether it is to be construed a sale or a mortgage.

It is certain that this deed was not given to secure a pre-existing debt. The connexion between the parties commenced with this transaction.

The proof is also complete that there was no negotia- tion between the parties respecting a loan of money; no proposition ever made respecting a mortgage.

The testimony on this subject is from Mr. Lyles him- self and from Mr. Charles Lee. There is some con- trariety in their testimony, but they concur in this ma- terial point: Mr. Lyles represents Alexander as de- sirous of selling the whole land absolutely, and himself as wishing to decline an absolute purchase of more than twenty acres. Mr. Lee states Lyles as having repre- sented to him that Alexander was unwilling to sell more than twenty acres absolutely, and offered to sell the residue conditionally. There is not, however, a

syllable in the cause, intimating a proposition to bor-
row money or to mortgage property. No expression
is proved to have ever fallen from Robert Alexander
before or after the transaction, respecting a loan or a
mortgage. He does not appear to have imagined that
money was to be so obtained; and when it became ab-
solutely necessary to raise money, he seems to have
considered the sale of property as his only resource.

To this circumstance the Court attaches much im-
portance. Had there been any treaty—any conversa-
tion respecting a loan or a mortgage, the deed might
have been, with more reason, considered as a cover in-
tended to veil a transaction differing in reality from the
appearance it assumed. But there was no such conver-
sation. The parties met and treated upon the ground
of sale and not of mortgage.

It is not entirely unworthy of notice that William
Lyles was not a lender of money, nor a man who was
in the habit of placing his funds beyond his reach.
This, however, has not been relied upon, because the
evidence is admitted to be complete, that Lyles did not
intend to take a mortgage. But it is insisted that he
intended to take a security for money, and to avoid the
equity of redemption; an intention which a Court of
Chancery will invariably defeat.

His not being in the practice of lending money is
certainly an argument against his intending this trans-
action as a loan, and the evidence in the cause furnish-
es strong reason for the opinion that Robert Alexander
himself did not so understand it. In this view of the
case the proposition made to Lyles, being for a sale
and not for a mortgage, is entitled to great considera-
tion. There are other circumstances, too, which bear
strongly upon this point.

The case, in its own nature, furnishes intrinsic evi-
dence of the improbability that the trustees would have
conveyed to William Lyles without some communica-
tion with Robert Alexander. They certainly ought to
have known from himself, and it was easy to procure
the information, that the money had not been paid. If
he had considered this deed as a mortgage, he would

ONWAY's EX'RS.
v.
ALEXAN-
DER.

naturally have resisted the conveyance, and it is probable that the trustees would have declined making it. This probability is very much strengthened by the facts which are stated by Mr. Lee. The declaration made to him by Lyles, after having carried the deed drawn by Mr. Lee to Mr. Hooe, that the trustees were unwilling to execute it until the assent of Alexander could be obtained, and the directions given to apply for that assent, furnish strong reasons for the opinion that this assent was given.

It is also a very material circumstance that, after a public sale from Lyles to Conway, and a partition between Conway and Charles Alexander, Conway took possession of the premises, and began those expensive improvements which have added so much to the value of the property. These facts must be presumed to have been known to Robert Alexander. They passed within his view. Yet his most intimate friends never heard him suggest that he retained any interest in the land. In this aspect of the case, too, the will of Robert Alexander is far from being unimportant. That he mentions forty acres sold to Baldwin Dade, and does not mention one hundred and forty acres, the residue of the same tract, can be ascribed only to the opinion that the residue was no longer his.

This, then, is a case in which there was no previous debt, no loan in contemplation, no stipulation for the repayment of the money advanced, and no proposition for or conversation about a mortgage. It is a case in which one party certainly considered himself as making a purchase, and the other appears to have considered himself as making a conditional sale. Yet there are circumstances which nearly balance these, and have induced much doubt and hesitation in the mind of some of the court.

The sale, on the part of Alexander, was not completely voluntary. He was in jail and was much pressed for a sum of money. Though this circumstance does not deprive a man of the right to dispose of his property, it gives a complexion to his contracts, and must have some influence in a doubtful case. The very fact that the sale was conditional, implies an expectation to redeem.

A conditional sale made in such a situation at a price bearing no proportion to the value of the property would bring suspicion on the whole transaction. The excessive inadequacy of price would, in itself, in the opinion of some of the judges, furnish irresistable proof that a sale could not have been intended. If lands were sold at 5*l.* per acre conditionally, which, in fact, were worth 15*l.* or 20*l.* or 50*l.* per acre, the evidence furnished by this fact, that only a security for money could be intended, would be, in the opinion of three judges, so strong as to overrule all the opposing testimony in the cause.

But the testimony on this point is too uncertain and conflicting to prevail against the strong proof of intending a sale and purchase, which was stated.

The sales made by Mr. Dick and Mr. Hartshorne of lots for building, although of land more remote from the town of Alexandria than that sold to Lyles, may be more valuable as building lots, and may consequently sell at a much higher price than this ground would have commanded. The relative value of property in the neighborhood of a town depends on so many other circumstances than mere distance, and is so different at different times that these sales cannot be taken as a sure guide.

That twenty acres, part of the tract, were sold absolutely for 5*l.* per acre; that Lyles sold to Conway at a very small advance; that he had previously offered the property to others unsuccessfully; that it was valued by several persons at a price not much above what he gave; that Robert Alexander, although rich in other property, made no effort to relieve this, are facts which render the real value, at the time of sale, too doubtful to make the inadequacy of price a circumstance of sufficient weight to convert this deed into a mortgage.

It is, therefore, the opinion of the Court that the decree of the Circuit Court is erroneous and ought to be reserved, and that the cause be remanded to that Court with directions to dismiss the bill.

*Decree reversed.*