# CHARLESTON.

## HURSEY v. HURSEY.

Submitted June 6, 1904. Decided November 1, 1904.

1. **DEED—***Mortgage—***Debt.**

   If, in a suit to have a deed absolute on its face declared a mortgage, it appears, from all the evidence, that, at the time of the execution of the deed, the grantee paid a debt for the grantor, and that the parties intended that the sum so paid should be and continue a debt due from the grantor to the grantee and secured by the deed, such payment will be so treated in equity. (p. 156).

2. **DEBT—***Deed—Rescission—***Mortgage.**

   An admission by the grantee in such case of a declaration, made by him at the time of the conveyance, of his willingness to receive back at any time within five years, the money advanced by him, coupled with the circumstances of retention of possession and payment of a large part of the taxes by the grantor, and continuous conduct of both parties, of such nature

as to indicate recognition of an equity or interest on the part of the grantor in the land, constitute sufficient ground for holding the deed to be in fact a mortgage.    (pp. 157, 158).

3.    DEED—*Mortgage—Rescission.*

When such deed is shown to have been intended to be a mortgage, a mere agreement of sale between the grantee or grantor, made long after the date of the conveyance, and without any new consideration, moving from the mortgagor to the mortgagee, does not alter the character of the original transaction. (p. 159).

4.    DEED—*Mortgage—Rescission.*

The intent of the parties at the inception of the transaction determines the character of the conveyance. If by this test it is shown to have been originally a mortgage, it remains a mortgage, unless the equity of redemption has been in some way extinguished.    (p. 159).

5.    POSSESSION—*Grantor.*

Explanation of the retention·of possession by the grantor, though sufficient to destroy the prdobative force of that circumstance when standing alone, will not overcome it and admissions by declaration and conduct on the part of the grantee. (p. 158).

Appeal from Circuit Court, Harrison County.

Bill by Augustus M. Hursey against John H. Hursey and others.    Decree for plaintiff.    Defendants appeal.

*Affirmed.*

E. G. SMITH and EDWARD A. BRANNON, for appellants.

HAYMOND MAXWELL, for appellee.

POFFENBARGER, PRESIDENT:

By this appeal, the soundness of a decree of the circuit court of Harrison county, declaring a deed absolute on its face, to be, and to have been originally intended by the parties to be, a mortgage, and the debt secured thereby to have been paid off, and ordering a reconveyance of the land to the grantor, is questioned. Hence, an examination of the findings of fact in the case, as well as the law upon the subject, is necessary.

The tract of land involved is small, containing only twenty-eight and three-fourths acres, and was not of great value at the date of the deed, October 31, 1887, but has since proved to be

valuable oil, gas and coal land.  On said date, Augustus M. Hursey, being the owner of the land and owing certain debts, some of which were liens upon it, executed to his brother, John H. Hursey, the deed in question, which contains the following recital as to the consideration: "For and in consideration of the sum of fourteen hundred dollars paid to the party of the first part in the following manner, to-wit, that is to say, said party of the second part is to pay to one Elmer B. Hursey the sum of $208.00 being the balance of the purchase money due said Elmer B. from said party of the first part on the land hereinafter conveyed said party of the second part is to pay D. G. Watkins, ad'r of William F. Kidd, the sum of five hundred and fifty-six dollars and fifty-three cents, being the balance due on a certain note, made by said party of the first part to said Kidd, which is secured by a trust on said land, said party of the second part is to pay Randolph Co. the sum of $163.24 being the amount of a judgment against party of the first part which is a lien on said land and the said party of the second part paid the sum of $471.13 the residue of said consideration to the party of the first part by crediting said party of the first part with the said sum of $471.13 on certain indebtedness owed said party of the second *party* by the said party of the first part."

As to the Elmer B. Hursey debt, the defendant, the grantee in the deed, filed as an exhibit, a release of the deed of trust by which it was secured, dated February 21, 1890, reciting that the debt had been paid by J. H. Hursey.  His payment of this debt seems not to be denied.  As to the debt due D. G. Watkins, admr. of Kidd, he filed a copy of a release of the deed of trust by which it was secured, dated December 24, 1887, reciting that the debt had been paid "by J. H. Hursey for said A. M. Hursey except the two credits of interest paid August 31, 1885, and July, 1866, which were paid by the latter to said decedent." John H. Hursey testified that he paid all of this debt and the unpaid interest thereon, but A. M. Hursey swears he furnished his brother $210.00 of the money used for that purpose.  The Randolph Co. judgment was a judgment of a justice in favor of B. F. Randolph, dated November 30, 1886, for $161.04 and $2.20 cost.  It remained unpaid until 1891, when the creditor, being under the impression that the lien had expired, took in lieu thereof, without releasing, however, three notes executed

by J. H. Hursey, A. M. Hursey and H. L. Hursey for the sum of $49.50 each. On two of these he afterwards acquired a judgment for $76.83 and $3.60 costs, against A. M. and H. L. Hursey only, the other debtor being then a non-resident. Later he obtained a similar judgment on the other note for $59.14 and $3.40 costs. Then as J. H. Hursey held the title to the land and was out of the state, he instituted a suit in equity with an attachment against him, and thereby secured a lien on the land and took a decree for $154.96 and $57.90 costs. J. H. Hursey satisfied this decree, taking a release dated November 30, 1895. As to it, he testifies that, on the 24th day of December, 1887, he delivered to his brother, A. M. Hursey, sufficient money to pay off this debt, upon his agreement to so apply it, but that he used the money for other purposes and failed to pay the debt. A. M. Hursey denies this, and says that, although his brother furnished him nothing for that purpose, he had himself reduced the debt to about $41.00 by payments and credits for lumber. If so, he must have done it after September, 1891, when the notes were given, and this is negatived by the judgment and decree, all of which seem to have been by default. J. H. Hursey paid another debt of A. M. Hursey, not mentioned in the deed, which was originally about $102.00, but which, with interest and costs when paid, amounted to about $171.30. A. M. Hursey does not claim to have paid any of this, but says the defendant should have avoided interest and cost by earlier payment.

As to the sum of $471.13, mentioned in the deed, J. H. Hursey insists it was credited on indebtedness due to him from A. M. Hursey as stated in the deed, but the latter says he owed him nothing and said statement was made simply for the purpose of making the detail of items correspond with the total amount of consideration named, and further, that J. H. Hursey had another demand against him which he supposed would be covered by the item of $471.13. This was the Lowndes debt for which J. H. Hursey was surety. He adds that they both thought the recital in question would be a protection in case he should become involved. The deed was acknowledged December 24, 1887, and on that date, A. M. Hursey executed his note to J. H. Hursey for $241.87, bearing interest from date, and reciting that it was given for borrowed money. This note has never been paid. The plaintiff denies having owed to him or borrowed from him

any money on that date.   J. H. Hursey says that at the time of the execution of the deed and note, he told the plaintiff he would be glad to accept for the land within five years the amount he had paid for it.   In May, 1890, the defendant borrowed money on the land of Mary C. DeQuaise.   He borrowed a considerable sum of money from one Farland also, securing it by deed of trust on the land, but the date of this loan is not given.   He says he borrowed that money to pay the E. B. Hursey debt and the Randolph debt, and that he paid Hursey December 24, 1887, and gave the plaintiff money to pay Randolph on the same day. He obtained a release from Watkins on that day but not from Hursey.   After this debt had become due, the land was advertised for sale, and, in order to procure money to satisfy it, the sum of $620.00 was borrowed from Leeman Maxwell, and payment thereof secured by a deed of trust on the land.   Of this sum, A. M. Hursey received $20.00 and J. H. Hursey $95.67 and the residue satisfied the Farland debt.   The plaintiff negotiated this last loan and the defendant says he gave him, or let him retain, the $20.00 for his trouble.

Both parties admit that, at about the time of this last transaction, when the land was threatened with sale for the Farland debt, it was agreed that if A. M. Hursey would obtain the sum of $600.00, pay that debt out of it, and pay the balance to J. H. Hursey, and pay him an additional sum of $900.00 within three years, making $1,500.00 in all, the land should be reconveyed to him.   The Maxwell loan was made August 16, 1898.   The plaintiff produces certain letters to him from the defendant, relating to the loan and their agreement, the first of which is dated August 11, 1898.   In it, after having said he had requested the trustee to postpone the sale of the land, he uses the following language, relied upon by the plaintiff: "If he does not put the sale off probably you had better get that man that you expect to get the money off to go on day of sale and buy land for you if sale can be put off I will give you three years if you can get the six hundred I am needing money very badly now I am building a house and am hard up."   The next is dated August 18, 1898, and says, among other things: "He (meaning the trustee) will pay off the Farland note and send *Balence* to me he will also get the release of the Farland note and have it recorded I have told Thompson to draw an article of an agreement which you

will sign." The next, dated August 24, 1898, says: "I have wrote to Thompson and told him to pay you the $20.00. You had not said anything to me about it & that is the reason why I did not tell him about it when I sent papers I hope things will be all right now and you will be able to pay Each year the amount you expect to pay and all will be all right. Gus I have built a house and have went in debt to build it so I hope you will have success in paying out so I can look for some money." Then follows one dated May 17, 1899, saying the writer is undecided about the leasing of the land for oil and gas on certain terms. To it he appends this: "I promised you the land for $1500.00 Dollars to be paid within three years from last August I think was the time. But you remember it spoken of that if during that time the land should become more valuable I would be entitled to more money. That land has cost me every cent of 2500.00 Dollars not saying anything about the interest on the money for ten years." Another dated March 1, probably 1900, (the printed record says 1890, which is evidently a mistake), says: "I have had 2 or 3 letters from different parties there wanting to buy land or lease it is there any oil or gas excitement there. Now I *though* there must be on account of getting letters from 2 or 3 different parties wanting to buy or lease. Gus the time is drawing near that the Maxwell note will have to be payed and you know that I will have to pay it or let the land be sold under the hammer which means great loss to any one that has to let property be sold that way of course you know what progress you have made toward the payment of the note by this time to fully know just whether or not you will be able to do so or not. If you feel that you will not be able to do so I think you should tell me so before the note is due so I could have a chance to sell the land and not have to let it go to a *forse* sale I would like for you to have the land but if you cannot raise the money to pay Maxwell & then raise the money for me it had better be looked after before it is too late when it becomes known that you cannot raise the money for Maxwell the parties who would buy it would rather see the land go to a *forse* sale so please *rite* me the facts in the case as to what amount you have paid on the debt." Another letter, dated August 18, 1900, says: "Your letter at hand in regard to land I had wrote you a letter yesterday did not get your letter until this morning Gus you did not make matters clear in regard to the Maxwell debt

that is the mortgage that Maxwell holds *againce* the land that six hundred Dollars of course was borrowed for you and I give him a deed of trust on the land you promised to pay that six hundred dollars in 3 years and you thought you could then borrow the money to pay me I told you I would take fifteen hundred dollars but you was to pay the debt to Maxwell I suppose you understand that but you did not state it clear in your letter I will be willing to do the fair thing which I think I have done all the way through. The land cost me $1641.00 fourteen years ago I will be willing to take $1500.00 with the understanding that if the land should turn out to be *valuble* On *count* of oil or gas or from any cause I think it would be no more than *rite* that I should have the amount in full and at least a part of interest that the money would of brought in that time." On September 6, 1900, he writes about the making of a deed and asks for a blank. On the 2nd day of April, 1901, John H. Hursey leased the land to O. A. Bingman and G. W. F. Randolph for oil and gas, receiving from them a cash consideration of $1,050, and then two days later, obtained from them an additional cash consideration of $1,000.00 for one-sixteenth of the oil and one-half of the gas reserved in the lease. On the day of the date of the lease, he wrote a letter, notifying his brother of its execution and asking the address of Maxwell, the holder of the deed of trust. On the 5th day of April, 1901, he wrote his brother as follows: "Gus you can rest easy now in regard to having a home there I can now lift the *morthage* without selling land and if it turns out to be a good thing I surely will remember you all kindly It will take the most of the money I got for lease to pay Maxwell but I hope it will turn out that good money will come from it yet. Gus if you will send me the address of Maxwell I will write him and if he will *except* the money now I will pay him and stop the interest." On July 26, 1901, he wrote another letter, saying: "Your letter at hand I will direct Thompson to make deed to *hoom* you may direct and that you will pay to him $900.00 for me and turn over to him the note I give to Maxwell and he can send them to me when he sends the other papers or after the matter is settled up I will write to Randolph & Bingman and direct them to transfer the lease to you that you may receive royalty and rental thereafter in fact I don't think there will be any need of a transfer of lease for I think the *makeing*

of the deed to you will be all that is *nessary.*" The other side
of this correspondence is not given. John H. Hursey says he·
did not preserve his brother's letters and his brother gives no·
clear statement of their contents. He claims to have had an-
other letter which he is unable to produce, and in which he says·
John H. Hursey told him he had written Mr. Thompson that,.
in case the land went to sale, he should deduct from the pro-·
ceeds thereof $1,641.00 and pay the residue to the plaintiff. If
this occured, it must have been about the time the land was ad-·
vertised for sale for the Farland debt. These letters, his own
testimony and that of his sister, Mrs. Gain, constitute all the·
evidence of admissions on the part of the defendant found in·
the record. Mrs. Gain says the defendant told her he had agreed
to let the plaintiff redeem, but she fixes the date of this conver-
sation in the year 1899, while the correspondence about the·
$1,500.00 proposition was proceeding.

In reviewing this decree, the rule, according much weight to·
the findings of the trial court upon issues of fact, must be kept
in view. The oral evidence, as well as the inferences arising.
from some of the established facts, presents conflict. How much
weight the circuit court may have given to the admissions of the
defendant both by declaration, in his testimony, and conduct
during the course of the dealings between the parties, it is dif-
ficult to say, and the application of this rule forbids any inter-
ference with the decree except after mature consideration and an·
abiding conviction that it is wrong. However, although firmly
established and universally recognized and enforced by appel-
late courts, it lays no restraint upon the power of the court to·
make a full investigation, and careful analysis, of the evidence
with a view to ascertaining whether there is such conflict and
whether the decision rests upon findings of fact supported by
substantial proof.

There is no evidence of any actual loan made at the time of
the execution of the deed. For proof of the existence of any
indebtedness to the grantee on the part of the grantor nothing
appears except the recital of the deed as to the $471.13, the·
note for $241.87 and the testimony of the defendant to the effect
that there was such indebtedness. His testimony on that point
is most unsatisfactory for he does not pretend to indicate how
this indebedness was incurred. His conduct contradicts his·

testimony for he paid the Lowndes debt, amounting originally to something over $100.00 and, when paid, to $171.30, not recited in the deed as a part of the consideration, but has never asserted or claimed, since that time, any demand against the plaintiff on account of this debt. He treats it as part of the money he claims to have paid for the land and not as a debt due from the plaintiff. True, he was bound to pay it as surety, but it was still the debt of the plaintiff. The evidence of the plaintiff, respecting the recital and the note, has been already referred to and need not be repeated here.

If it be assumed that there was no such indebtedness, the transaction presents a rather anomalous feature. The defendant, upon the theory of the plaintiff, accepted these conveyances, assumed the payment of certain debts of the plaintiff, agreed to hold the title to the land for him, carrying this indebtedness until such time as the grantor should be able to pay off the debts or reimburse the grantee for such debts as he might pay. At first this would seem to call for some discussion as to whether the principle announced in point 3 of the syllabus in *Troll* v. *Carter,* 15 W. Va. 567, applies and prevents the assertion of a parol trust by the grantor under his own deed, absolute in form. But the operation of the statute of frauds and the rule against varying, or adding to, a deed by parol evidence is excluded by the existence of indebtedness shown in another way. The deed was not delivered until the 24th day of December, 1887, and on that day, as part of the same transaction, the grantee paid a debt of the plaintiff, one of the debts mentioned in the deed as hereinbefore shown. If the evidence shows the parties treated this sum as a debt and intended it to be a debt due from grantor to grantee, it will be so held in equity. "It seems to be clear and upon admitted principles of law, that on the payment of H. & A. to L. & T. of the money due from S. to L. & T., S. became the debtor of H. & A. for that amount as it was paid at his request and for his benefit." *Stephenson* v. *Allen,* 11 Ore. 188. See opinion page 192. To the same effect is *Brumfield* v. *Boutall,* 24 Hun. (N. Y.) 451.

"Once a mortgage, always a mortgage," is a maxim of universal application. Though its operation is subject to certain limitations, these must rest upon a new contract based upon a sufficient valid consideration. Without the introduction of some

new element, working a decided and substantial change in the relationship of the parties, that of mortgagor and mortgagee, when once established, must be observed and the principles applicable thereto enforced in the settlement of their rights. Jones on Mort. § 263; *Russell* v. *Southard,* 12 How 139; *Conway* v. *Alexander,* 7 Cranch 218. It takes a new agreement, based upon an adequate consideration, to do away with this relationship. There is in the mortgagor an equity of redemption, a valuable right, for the extinguishment of which a consideration is necessary. *Villa* v. *Rodrignez,* 12 Wall. 323. Possibly it could be donated, relinquished voluntarily, without consideration, as any other species of property may be, but the proof of such disposition of it must be positive, clear and unequivocal. It must rest upon something more substantial than mere inference, drawn from conduct or casual declarations of the parties. A subsequent agreement that a mortgage shall be regarded as an absolute conveyance will not be sustained, unless shown to have been fairly made and without the exercise of undue advantage by the creditor. "Where an absolute deed is given as a security for a debt, chancery will treat it as a mortgage, though the defeasance rests in parol, especially if the grantor continues in possession. Where the deed was so executed, and the mortgagor afterwards took a lease of the premises from the mortgagee, and the mortgagee, with an intent to veil the transaction and cut off the equity of redemption, covenanted to reconvey to the mortgagor on the payment of a sum of money by a time specified; *It was held,* that, although the lease and covenant gave the transaction the appearance of a conditional sale, still the relation of mortgagor and mortgagee was not thereby destroyed." *Wright* v. *Bates,* 13 Vt. 341. See also *Henry* v. *Davis,* 7 Johns. Chy. (N. Y.) 40; *Mills* v. *Mills,* 26 Conn. 213.

As already stated, the defendant says he told the plaintiff, the grantor in the deed, at the time it was made, that he would be glad to accept, within five years, the amount he had paid for the land. At that time money was obtained from some source with which to pay a considerable part of the grantor's indebtedness, namely, the $556.00 debt due the estate of Kidd. The grantor says he furnished $210.00 of the money with which to pay it. Assuming that he did, more than $300.00 additional

money was necessary. Either for this purpose or the payment of some other debts, money was obtained from Farland for which a deed of trust upon the property was executed. When this debt became due and the creditor advertised the land for sale, the defendant seems to have relied upon the plaintiff to obtain the money from some source with which to save the land, and the plaintiff appears to have been very anxious to do so and to have exerted himself to that end. When it seemed doubtful as to whether this would be accomplished, the defendant wrote his brother saying that, if the trustee did not postpone the sale, he would better get the man from whom he expected to obtain the money to buy the land in for him (the plaintiff). By this he laid grounds for the inference that he felt that his brother had a deeper interest in the matter than he, and that the former must protect and save himself and was at liberty to do so, if possible, by having some one purchase the property for his benefit. In the event of a postponement and success in raising the sum of $600.00 by a new loan on the property, he wanted the excess over the amount necessary to discharge the debt, because he was needing money badly and would give time for the payment of additional money which he hoped to get out of the land. Added to this, is the further circumstance that the grantor was permitted to remain in possession of the property and use and occupy it as his own. No rent was ever demanded from him and the payment of taxes seems to have been left to his care. During the whole period from 1887 to 1901, the taxes were, for the most part, paid by the plaintiff. On one occasion, when he was pressed by the officers for the taxes and unable to pay them, the defendant paid about $35.00. He may have paid for some additional years, but the taxes seem to have been paid in the main by the plaintiff. Possession of the land by the grantor, whether rent be nominally reserved or not, and if no rent is even professedly reserved, is entitled to very great weight, if unexplained. *Vangilder* v. *Hoffman,* 22 W. Va. 1, (syl. pt. 7.) It is insisted, however, that a sufficient explanation of this circumstance has been furnished by the defendant, who testifies that he permitted this by way of courtesy to his brother and two sisters who made their home there the greater part of the time. This position is taken upon the authority of *Edwards* v. *Wall,* 79 Va. 321. In that case, however, possession of the

grantor was about the only circumstance relied upon by the plaintiff as evidence of the character of the conveyance, save that out of part of the lands sold the purchaser paid the grantor his debt, for the payment of which the land had been threatened with sale at the time of the conveyance. There was no evidence of any admission on the part of the grantee that the conveyance had any character other than that evidenced by its face. On the contrary, the notary who took the acknowledgment testified that, before the deed was signed and acknowledged, the grantor asked that some clause be put in reserving to him some right in the property, and that the grantee remarked that he would not put any provision in the deed, and that if it were not signed as written, he would not touch it. Moreover, no claim that the deed was intended to be a mortgage was asserted until shortly before the suit was instituted. In the case now under consideration, the defendant testifies to an expression made to the plaintiff at the time of the conveyance of his willingness to take his money back and release the land at any time within five years. Long before this suit was commenced, the sum which he was willing to take was fixed at $1,500.00. He says this was a contract of sale, but the plaintiff says it was an abatement of $141.87 from what the defendant had formerly fixed as the amount of the redemption money, and a continuation of the original agreement and understanding for redemption thus modified. Such a modification would not convert what was originally a mortgage into a contract of sale. To have that effect, the new agreement must be predicated upon a consideration, and it is not pretended that any was given or agreed to be paid to the plaintiff by way of extinguishment of his right to redemption. The conclusion of the trial court probably rests more upon the admission of the defendant to which reference has been made than any other circumstance. The great weight of such admission, or evidence tending to establish it was adverted to in the case of *Sadler* v. *Taylor,* 49 W. Va. 104, 120.

He says he made that statement at the inception of the transaction, at the time of the conveyance. The intent at that moment determines the character of the conveyance. *Sadler* v. *Taylor,* cited; Hogg's Eq. Prin. 715; *Dabney* v. *Green,* 4 H. & M. 101. Although he does not say a loan was made, or that he then

said the deed was to be treated as a mortgage, or that he used the word redeem, he did say he would receive back his money, and, of course, a reconveyance would follow. He does not say that agreement was for a re-purchase. As to what he then said his statement is indefinite, except in respect to his willingness to be reimbursed. That, he clearly and fully admits, and the admission is to be construed in the light of the conditions then existing and the subsequent conduct of the parties, bearing in mind that doubtful cases are generally decided to be mortgages. *Conway* v. *Alexander,* 7 Cranch 218, 237.

It has been truly stated that the defendant was not a money lender. He was a poor man himself, taking upon himself a great burden for the relief of a distressed brother and sisters. It may not be the ordinary case of a conveyance to secure an antecedent debt or a direct contemporaneous advance, and the motive for the acceptance of the conveyance may not have been that which usually impels such action. The defendant was surety for some of these debts and this circumstance may have influenced him. But, whatever his character, or the inducement to the conveyance, he obtained by it a position of advantage over the grantor respecting the title and not in the usual and ordinary mode of purchase, and no reason is perceived why the general principles and rules governing inquiry into the class of conveyances to which this one is said to belong, should not be applied.

Another objection to the decree is that it treats the indebtedness of the plaintiff to the defendant as having been satisfied by the oil lease bonus of $1,050.00 and the $1,000.00 realized from the sale of one-half of the oil and gas reserved. Counsel for appellants say the indebtedness amounted to $3,639.00, which exceeds the amount received by the defendant from the oil and gas by the sum of $1,589.00. This contention ignores some facts favorable to the plaintiff that are perfectly apparent from the face of the record. The Farland loan paid all, or the greater part, of the large Kidd debt. If the defendant's evidence is true, it paid about $300.00 and the plaintiff received the balance of that loan. That loan itself was paid out of the Maxwell loan and the plaintiff put into his own pocket practically all of what remained of the Maxwell loan. It also includes $713.00, the aggregate of the $241.78, and the $471.13 recital of the deed, the doubtful characters of both of which has been

adverted to. As to the amount of the indebtedness, the evidence conflicts violently. The trial court has passed upon it, and no ground is perceived upon which the finding can be disturbed. There is evidence, both direct and circumstantial, to sustain it.

For the reasons above stated, the decree should be affirmed.

*Affirmed.*