Spence *et al. vs.* Steadman.

D. W. Spence *et al.,* plaintiffs in error, *vs.* Enoch Stead-
man, defendant in error.

1. In this case, we think, under the answers and the incontestible facts of the case, the Chancellor erred in enjoining the executions. They, and the connection of the defendants with them, had nothing whatever to do with the controversy growing out of the transaction in September, 1871. The defendants had a perfect right to buy them, and so far as appears by anything in these proceedings, they have a right to collect them.

2. It is a well settled rule of law that parties may, if they please, *really* and *truly* sell property for a consideration actually passing, and at the same time secure the right to repurchase it at a future time for an agreed price, and if this be really the intent of the parties, the law will enforce it. It is also true that the difference between such a transaction and a mortgage is often a very nice one, and that the Courts will scrutinize the matter very closely to discover whether there was, in fact, anything more intended than to provide a security for money due or advanced at the time, and all the facts will be looked to in search of the truth of the case. The great cardinal rule for testing the intent seems to be whether or not the relation of debtor and creditor was intended to exist between the parties—whether the property was taken in *satisfaction and discharge* of the sum due or advanced; or whether, notwithstand-

ing the words of the conveyance, the relation of debtor and creditor was still to exist, to-wit: the right of the one to demand, and the obligation of the other to pay. Under this rule, we think, from the bill and answers, that the transaction begun in June, 1871, by the complainant's offer, and accepted and acted on by both in September, 1871, as evidenced by the complainant's proposal, the defendants' acceptance, and the deed, lease, bond and payments furnish, so far as appears from the face of the papers, or from any facts appearing at the hearing, taking the answers of the defendants as evidence, was a contract of sale, lease and agreement to permit the complainant to rebuy, and not a loan of money, and scheme to evade the usury laws ; at least, that under the uncontradicted answers of the defendants, it was error in the Judge to have considered the charges of the bill so far made out as to justify the injunction on that ground. What may be the truth of the case, as it may be made out at the trial before a jury, is not now the question.

3. As it is admitted on all hands that the $10,000 00 to be advanced for machinery has never, in fact, been advanced, and as it is perfectly apparent that this $10,000 00 was in the minds of the parties in fixing the amount to be paid on the repurchase, and as from the bill, answers and other facts in the bill and papers before the Court, there is strong reason to believe that the rent was fixed at $10,000 00, instead of $8,000 00, in view of the expectation of all parties that this advance would be made and the complainant get the benefit of it under his lease, and as it is admitted that the complainant has paid the $8,000 00 for the rent of 1872, according to his construction of the amount really intended by the contract; we are of the opinion that the facts, as they appear by the bill and answers, and by the proposition, lease and bond, justify the Court in considering the complainant to have made out such a *prima facie* case of compliance with the real intent of the lease as to authorize an injunction against his eviction for his failure to pay the $10,000 00, instead of $8,000 00, for the rent of 1872, and that the injunction against his eviction should be continued until the 1st of January, 1874, provided he keep the property insured, as agreed upon, and promptly pay $8,000 00 rent for 1873, in quarterly payments, on the 1st of April, July and October, and the 31st of December, 1873, with the right to rebuy at the end of 1873, as provided in the bond, leaving the real truth of the amount of the rent for 1872 and 1873, as well as whether the transaction of September, 1871, was a mortgage or sale—the question of usury and the other questions made to be finally settled by the jury on the trial.

Mortgage. Sale. Conditional deed. Debtor and creditor. Injunction. Before Judge GREENE. Newton county. At Chambers. January 18th, 1873.

Enoch Steadman filed his bill against D. W. Spence and O. S. Porter, alleging, in substance, that in June, 1871, he was the owner of a large property in Newton county worth $100,000.00, consisting of land on which was a cotton factory; that he was considerably in debt; that his debts were pressing and he was desirous to raise money; that with this view he made a written proposal to defendants to sell them his property at $50,000 00, $40,000 00 to be used for paying his debts, and $10,000 00 to remain in defendants' hands to be invested in new machinery under his order. This written proposal stipulated that cotemporaneous with the sale, defendants were to give a bond to resell him the property at the end of 1872 for $50,000 00 cash, and to lease it to him for 1872 for $10,000 00 rent, payable quarterly, with the further stipulation that if he paid the rent promptly, he was to have the right to keep the property, under lease, on the same terms, for 1873, and that the right to rebuy, in that event, was to be extended. It was further stipulated that complainant was to keep the property insured for $30,000 00 during the lease. The bill stated that the defendants accepted the proposition, and that on the 19th day of September a deed, lease and bond were executed as proposed, the deed expressing $40,000 00 as consideration; that the $40,000 00 was not paid over to the complainant, but was left with defendants to be paid to certain judgments, etc., and other claims pressing complainant.

The bill further charged that the whole scheme was a mutual device to loan and borrow money at illegal interest and avoid the usury laws; that such was the intention of complainant, and that defendants participated in this purpose and intent.

The bill further charged that defendants had not paid the money to his debts, as they agreed; that they had bought up some at a discount; had other judgments transferred to themselves, and were about to levy them on his other property.

The bill further charged that the rent was fixed at $10,000, because that was the amount of the interest agreed upon for $50,000 00, to-wit: twenty per cent. The bill further charged

that having determined not to increase the machinery as contemplated, he had never ordered it, and that the $10,000 00 had never been advanced by defendants, as contemplated. The bill also showed that he had paid $8,000 00 rent for 1872, to-wit: twenty per cent. on $40,000 00, but that defendants claimed the whole $10,000 00, and were threatening to eject him as a tenant holding over, unless he paid the same, as well as insisting that his right to rebuy, or lease for another year and then rebuy, was dependent on his payment of the whole of the said $10,000 00 rent each year promptly. The bill then prayed that an account be had between them of the debt contracted, the usury and the payment, and offered to pay what might be found really due. The bill also prayed that the defendants might be enjoined from ejecting him and from levying any *fi. fas.* defendants might control on any of the complainant's property, and application was made to the Chancellor for an injunction until the final hearing. The Chancellor called on defendants to show cause, and they answered.

They admitted the written offer of complainant to sell, lease and rebuy, but positively denied that there was any agreement or understanding in any way that it was a loan of money; that it was a positive sale, just as stated in the deed, lease and bond, and no more or no less; denied that there was any intent expressed or understood that it was a loan or a device to evade the usury laws; denied that the money was not paid, but set up that either on the day of the transaction, or soon afterward, they had fully paid the $40,000 00, dollar for dollar, to the complainant's debts, under his direction, and according to the agreement at the time; that they had paid the debts, dollar for dollar, and paid only such debts as complainant had directed, and that such debts and judgments had been settled (not transferred to them,) and turned over as settled by them to the complainant, and they set forth these payments, receipts, etc., in detail. They admitted that they had now in their control certain judgments against complainant, but stated that they had bought them with their own funds,

and to protect their property thus purchased, and insisted that they had a right to collect them from complainant's other property. They admitted that they had never advanced the $10,000 00 for the new machinery, but said they had been ready to do it, but the complainant had never asked for it by ordering the machinery. They denied that the property was worth $100,000 00, but insisted that it was worth little, if any, more than $40,000 00. They offered several affidavits, especially that of the scrivener who wrote the papers sustaining the answers, as to the fact that a sale, and not a mortgage or security, was intended. The complainant also filed affidavits in aid of his charge as to the value of his property, as well as to some sayings of the defendants, to the fact that they did not want the property, but only to get good returns for their money and be safe.

The Chancellor granted the injunction as prayed, and the defendants excepted.

J. J. FLOYD, for plaintiffs in error.

B. H. HILL & SON; CLARK & PACE; SPEER & STEWART, for defendant.

McCAY, Judge.

A sale with an agreement to repurchase, or as is usually termed a conditional sale, though nearly allied to a mortgage, is yet very distinct in its effect, if the terms of the condition be not complied with. By the strict rules of the common law even in the case of a mortgage, if payment was not made according to the agreement, the estate was forfeited, and the title remained absolutely in the mortgagee. But Courts of equity, taking into consideration the important fact that it was not the intent of the parties to sell, but only to secure the payment of a debt, came to the relief of the mortgagor and gave him the right of redemption even after condition broken. The fundamental idea of the doctrine of the equity of redemption in a mortgagor, was that it was not the *intent* of the parties to sell and buy—that the transaction was, in truth, an arrange-

ment to secure the payment of money, and that on the payment of the money due, with lawful interest, the whole intention of the parties was complied with. But when cases arose in which it appeared that the loan or securitiy of money was not the intent, but that there was a real intent to sell and fix a condition of repurchase, which might or might not be afterwards performed by the mortgagor, all the foundation for the interference of equity was gone, and the parties were necessarily left to their contract as they made it. In reference to a conditional sale, Chief Justice MARSHALL, in Conway *vs.* Alexander, 7 Cranch, 237, says: "To deny the power of two individuals capable of acting for themselves, to make a contract for the purchase and sale of lands, defeasible by the payment of money at a future day, or in other words, with a reservation to the vendor of the right to repurchase the same land at a fixed price and at a specified time, would be to transfer to the Court of chancery, in a considerable degree, the guardianship of adults as well as infants."

Such contracts may be made under circumstances, and by words, which not only make the intent plain, but show that such intent was the natural and probable course for the seller to take under the circumstances. It is unquestionably sometimes difficult to determine what was the real intent. Men having money to lend, or debts to secure, not unnaturally desire to put the debtor under as strict and heavy terms as they can exact from his necessities; and thus, often, when the real intent is *only security,* they obtain instruments having all the forms of a conditional sale. It is, therefore, a settled rule that the mere form of the paper—the words used—such as purchase, sale, repurchase, etc., if the real intent be only to secure the payment of money, will not make the instrument other than a mortgage: 4 Kent's Com., 144. And equity will lean to the construction that will give to the vendor the right to redeem: 23 Pickering, 529. In 6 Watts, 131, Judge GIBSON says, it is too late to say that what was intended to be a security for money may become a conditional sale by the accidental form of the transaction, or that an agreement to make

it such, in default of payment, may not be relieved against, or that a jury are not the proper judges of the intent."

The great question in every such case is, what was the intent of the parties? We are very clear, from the *answers and affidavits* here, that it was the intent to make a conditional sale—that the relation of debtor and creditor did not at any time exist, and that if, at the end of the first or second year, Steadman fails to buy, these parties have no remedy against him. If the property burns up, if the dam breaks, if Steadman refuses to insure the property, the whole risk is on the part of the defendants. Steadman does not owe them a dollar except for rent. If the mills should, as we have said, get burned up, and the defendants lose in any way the insurance, which at best is only three-fourths of the value, they have no right to go on Steadman for any debt but the rent. In fact, the relation of debtor and creditor does not and never did exist between them. Now, if this is a mortgage as to Steadman, it is a mortgage as to the defendants, and he owes them the amount of their payments with interest. It seems to us that all the facts indicate that such was not the intent of the parties. There was a better way to secure money than that. Some of their money was already better secured. They had judgments for it, and it was easy to put their whole payment in that shape by paying and taking a transfer of the other judgments which their money *discharged.*

As a matter of course, we do not say, or undertake to say, what a jury may find in the proof as it will be made on the trial. The question of intention is one of fact, to be decided from all the circumstances, including the papers. It is impossible to lay down any accurate, rigid rule by which to ascertain the motives of the parties. They are to be gathered from all the circumstances. Even the papers are open to contradiction by parol, though in this State, if *the possession has changed*, a deed absolute on its face cannot be shown to be a mortgage, unless, indeed, fraud in its procurement is the issue: See Revised Code, 3756.

In this case Steadman remained in possession, for if the real

intent was only to secure the payment of the money which these defendants advanced to take up the executions, or which was due them on the executions they held, and which they entered satisfied, we do not think the putting the interest in the shape of rent, and the agreement that Steadman should be the tenant of the defendants, would change the possession. A lease is consistent with the relation of mortgagor and mortgagee. Hence a lease does not change a mortgage to a conditional sale : See Kunkle *vs.* Wolfersberger, 8 Watts, 131. And we think that section of the Code, denying the right of showing by parol that an absolute deed was intended as a mortgage, when the deed is accompanied by the possession of the property, means an actual possession, and not that sort of possession which consists in agreeing to hold possession for the grantee in the deed. The statute evidently recognizes the formal change of possession as an *act* indicating on the part of the grantor in the deed, by the deliberate abandonment of his own possession, that his agreement is fully expressed in the deed. The consent to be the tenant of the grantee is only another term of the agreement, and is not an act in *furtherance* and in pursuance of the agreement indicating that it is in truth what it purports to be.

As we have said, the whole question is one of intent. If Steadman's account of the transaction, as contained in the charges in the bill, be the true one, the intent was, doubtless, a mere device to secure money and to get illegal interest. But if the answers of the defendants, and the decided weight of the affidavits, state the truth of the case, then it was almost certainly a conditional sale. The form of the papers, the words used, the acts of the parties at the time, as the absence of any evidence of debt as a note or bond, the satisfaction of the judgments, the taking of receipts from Steadman, the want of any great disparity between the real value and the amount paid by the defendants, and the strong, decided, positive statements of the answers, and the affidavit of the scrivner who wrote the papers, are, so far as the issue of injunction or no injunction is concerned, very strong in favor of a conditional sale.

On the other hand, there is really nothing but the statements of the complainant and the general suspicion which, in the nature of things, must attach to all such transactions. The strongest view of the case for the defendants is, to our mind, the evident intent that the right to repurchase is optional with Steadman. He may buy back, if he pleases; or if he pleases, he may not.

If, at the end of the first or second year, the property is still worth the money, and he is able, he has, by the bargain, the right to repurchase; but if the property has depreciated, or if he thinks he can do better in some other way with his money, he can let it alone. Even Steadman, himself, does not, in his own statements, say or pretend that the intent was otherwise than this. If this was the truth of the transaction—if it was, in fact, simply a contract of sale, with a *right*, an *option* in Steadman to rebuy, with no corresponding right, either express or implied, in the other parties to insist on the repayment of the money—then it was not a mortgage. We do not mean that there shall be an express stipulation of this right to the lender. If the facts, the nature of the transaction indicates it, that would be sufficient. There may be, too, when the case comes to a trial, something added by the proof to the charges in the bill, that, whether there was any agreement in terms of a loan or not, the real intent of the whole transaction was to evade the usury laws; not to make a mortgage, in terms, either in writing or by parol, but to violate the law against usury, and thus bring the transaction within the usury law, so as to make it void.

But as the bill, answers and affidavits now before us make the case, it seems to us almost impossible to escape the conclusion that the intent was *to sell* and *to buy*, giving to Steadman the right to rebuy. He had a right to make such a bargain, if he pleased. If, with his eyes open to the risk he was running, he did, in fact, sell his property, then rent it, intending or giving the others to believe that he intended, in reality, to sell, and to reserve the right to rebuy if he saw fit, he has made his own bed and must lie down under it. As we have

Spence *et al. vs.* Steadman.

said, under the evidence before us, that appears to have been the intent of both parties, and for this reason, we think the injunction ought not to have been granted, as prayed for.

As to the executions sought to be enjoined, the answers are so positive, decided and specific (and there is nothing in any of the affidavits contrary to them,) that unless the rule that the defendant is entitled to the benefit of his answer in the granting or dissolving an injunction is to be entirely disregarded, we see no reason for the injunction. All the moneys covered by the original trade are fully accounted for by receipts under the complainant's own hand, and the ownership of these *fi. fas.* seems almost without question to be in the defendants, by purchase and transfer, entirely independent of the contract originally made. We think the injunction as to these *fi. fas.* is entirely improper, and that there is nothing in any of the facts appearing at the hearing to justify the Court in staying the regular process of the law, as to them, however hard it may be.

We think, however, there is ground for an injunction. It is very apparent that the defendants have avowed their intention to insist on the payment of the full $10,000 00 rent. And if complainant fails to pay that, they have given him notice that they will treat the condition as broken. Perhaps, by the strict letter of the contract, they are right, but one cannot but feel, on the reading of the contract itself, that the additional machinery to be bought with the $10,000 00 was a large ingredient of the rent. That money has not, in fact, been paid. The defendants still have that money, and the complainant has not got the benefit of it. And, whilst we have some doubt of the power of a Court to interfere, yet, under the circumstances, we think the defendants ought to be restrained from insisting on more rent for 1872 than has already been paid; at least, that he be not allowed to take possession for non-compliance with the conditions until a jury can, on regular proof by both parties, pass upon the issue.

Judgment reversed, with instructions.