[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 27, 2007
THOMAS K. KAHN
CLERK

_____

No. 04-15891

_____

D.C. Docket No. 04-01189-CV-RWS-1 & 01-65356 BKC-PW

IN RE: RICHARD JON COX,

Debtor.

_____

R. DENNIS CHRISTOPHER,

Plaintiff-Appellant,

versus

RICHARD JON COX,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 27, 2007)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and LIMBAUGH,[*] District Judge.

PER CURIAM:

The question this appeal presents is whether the bankruptcy court erred in determining that the contemporaneous execution of a warranty deed to a tract of land and a contract giving the grantee an option to purchase the land within a time certain created a mortgage in which the grantee became the mortgagor and the grantor the mortgagee. The district court found no error and upheld the bankruptcy court's ruling. We affirm.

## I.

### A.

In 1984, Richard Jon Cox became the owner of the Bar C Ranch (the "Ranch"), a 450-acre tract of land on the outskirts of the City of Covington, Georgia. In 1994, Cox sold a half interest in the Ranch to Lamar Banks. AgSouth Farm Credit, ACA financed part of Banks's purchase by loaning him $775,000.[1] A mortgage on the Ranch, executed by Banks and Cox as tenants-in-common, secured the loan. Soon after Banks acquired his interest in the Ranch, he and Cox

---

[*] Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri, sitting by designation.

[1] The loan was made by AgSouth Farm Credit, ACA's predecessor, West Georgia Farm Credit, ACA; we refer to both as "AgSouth."

2

entered into a buy-sell agreement, whereby either could offer to purchase the other's interest in the Ranch for $750,000 or more.[2] The party receiving the buy-out offer would have the option to purchase the offeror's interest for the price indicated in the buy-out offer.[3]

On October 6, 1999, Banks offered to purchase Cox's interest for $875,000.[4] As Cox was considering the offer, the property was being appraised at $2,445,700. On November 16, after the appraisal had been completed, Cox exercised his option to purchase Banks's interest for the same price, $875,000.[5] Under the buy-sell agreement, Cox had ninety days to close. To close the transaction, Cox would need more than $1.2 million: $700,000 to pay off the AgSouth mortgage and more than $500,000 for Banks's interest (after deducting Banks's share, $300,000, of the balance due on the AgSouth mortgage).[6]

Cox sought a loan from the Main Street Bank, in Covington, to finance the

---

[2] The agreement set a floor value on the property as a whole of 1.5 million.

[3] Under the buy-sell agreement, the offeree had 30 days to exercise his option to purchase the property. If he did not do so, the offeror had 90 days to close the transaction.

[4] Banks was treating the property as a whole as worth $1.75 million.

[5] Cox waited more than the 30 days allotted him under the agreement to exercise his option to purchase the property. See note 3, supra. The record is silent as to why Banks did not consider Cox's November 16 exercise of the option a nullity. All we know is that he treated Cox's exercise as timely.

[6] These figures are approximations. The exact amounts are not material for our purposes.

3

buy-out. The bank agreed to make the loan provided that someone acceptable to the bank guaranteed the loan. Cox turned to R. Dennis Christopher for help. Christopher was his insurance agent and a long-time friend; he was also an experienced real estate investor. Christopher agreed to guarantee the loan, and so notified the bank. The bank, meanwhile, reconsidered the matter; if a loan was to be made, it would be made to Christopher alone. Christopher was not interested, however; he was not going to sign a note for $1.225 million. He was willing to help Cox out, but not that way. Christopher had an alternative plan in mind, which he proceeded to execute.

Rather than borrowing $1.225 million to pay off the AgSouth mortgage and Banks's interest in the Ranch, he would obtain AgSouth's consent to his assumption of the mortgage. If AgSouth consented, all he would have to advance at the closing would be the funds sufficient to pay Banks – funds he either had on-hand or readily accessible – and the closing costs.

AgSouth agreed to Christopher's assumption of the mortgage, and the closing went forward on February 16, 2000. At the closing, Christopher assumed the AgSouth mortgage and paid Banks for his equity in the property. His out-of-pocket outlay totaled approximately $545,000.

Several documents were executed at the closing. Two are pertinent here: a

4

warranty deed executed by Cox, as grantor, in favor of Christopher, as grantee, and an option contract.[7]  The contract gave Cox the option to purchase the property within 365 days.  The purchase price would amount to the sum of the following, with interest at the rate of 9.25% per annum: the costs Christopher incurred in connection with the February 16 closing; the amount he paid to Banks; his mortgage payments to AgSouth; any expenditures he may have made to maintain the Ranch; and a $100,000 "kicker."  Unless Cox exercised the option, however, he would owe Christopher nothing.[8]

Christopher did not take possession of the Ranch after the closing.  Instead, Cox continued to reside there rent-free, paid the property taxes, and kept the property insured.  And Cox immediately set about the task of finding a purchaser for the Ranch – at a price sufficient to adequately compensate him for his equity in the farm and cover what Christopher would be due under the option contract.  Several residential developers expressed an interest in the property; some extended offers to purchase it.  The offers came to naught, however.  On March 5, 2001, after two extensions, Cox's option to purchase the property expired.

---

[7]  The consideration cited in the warranty deed was "ten dollars and other good and valuable consideration."  The consideration cited in the option contract was "one dollar."

[8]  The option contract did not state, but the parties nonetheless agreed, that if Cox exercised his option, he would grant Christopher, as his real estate agent, a non-exclusivelisting for a 5% commission.

B.

After Cox's option expired, an associate of Christopher's, acting on Christopher's behalf, contacted, Dwayne Key, a realtor who earlier had made an offer (to Cox) for the property that fell through. Over the next three months, between March and June 2001, Key, in turn, located two potential buyers for the land.

Meanwhile, on April 20, 2001, Cox petitioned the United States Bankruptcy Court for the Northern District of Georgia for Chapter 11 relief. Shortly thereafter, as debtor-in-possession, Cox commenced an adversary proceeding against Christopher to determine the extent of the bankruptcy estate's interest in the Ranch. Christopher answered the complaint, alleging that he owned the property by virtue of the warranty deed Cox had given to him on February 16, 2000. Christopher also filed a counterclaim, in an attempt to recover rent for Cox's occupancy of the Ranch after his option expired.

Pursuant to an order issued by the bankruptcy court, the property was sold at auction on July 18, 2001 for $2.8 million. The sale closed the following month. The proceeds of the sale were used to (1) satisfy the balance due on the AgSouth mortgage, (2) reimburse Christopher for the monies he had paid AgSouth and Banks, and (3) pay Christopher the $100,000 "kicker," interest (at 9.25% per

annum) on the funds he had advanced, and his attorney's fees.

On October 9, 2003, the bankruptcy court held a bench trial in the adversary proceeding. After considering what Cox and Christopher had to say, the testimony of their witnesses, and the documentary evidence presented, the court rendered its decision on October 20, 2003. The court found that, under the circumstances leading up to and surrounding the parties' dealings, the parties intended that the warranty deed and the option contract create a mortgage. Cox's estate was therefore entitled to the balance of the $2.8 million that had been paid for the Ranch.

Christopher appealed the decision to the district court. Concluding that the bankruptcy court's findings of fact were not clearly erroneous and that the court's application of Georgia law to those findings was correct, the district court affirmed. This appeal followed.[9]

## II.

The proposition that a transaction that is, on its face, an absolute conveyance of title, may, in actuality, convey title only as security for a loan is

---

[9] Like the district court, we review the bankruptcy court's findings of fact for clear error and the court's conclusions of law and mixed questions of law and fact de novo. See In re Calvert, 907 F.2d 1069, 1071 (11th Cir. 1990).

black letter law.  See Restatement (Third) of Prop.: Mortgages § 3.2 (1997).  It is necessary to look beyond the four corners of some conveyances – to consider parol evidence – to determine, in light of all the circumstances, whether the parties to the transaction intended to transfer title or create to create a mortgage.[10] See Russell v. Southard, 53 U.S. (12 How.) 139, 152, 13 L.Ed. 927 (1851);  Conway's Ex'rs and Devisees v. Alexander, 11 U.S. (7 Cranch) 218, 237, 3 L. Ed. 321 (1812); Spence v. Steadman, 49 Ga. 133, 138 (Ga. 1873).[11]

Georgia law has long recognized that the determinative factor in distinguishing a mortgage from an absolute conveyance is the intent of the parties. See Monroe v. Foster, 49 Ga. 514, 519 (Ga. 1873) ("[I]f . . . it appear that the loan of money and security for its repayment was, in truth, the purpose and intent of the parties, it will be treated as such, notwithstanding very strong language may be used at the time to give it a different appearance."); see also Restatement (Third) of Prop.: Mortgages § 3.2 (1997).  The intent of the parties in a given scenario is a question of fact.  Spence, 49 Ga. at 139 ("The question of intention is one of fact,

---

[10]  This is done because lenders often seek to disguise mortgages as conveyances to avoid the pro-mortgagor regime of law.  See Restatement (Third) of Prop.: Mortgages § 3.2 cmt. a (1997).

[11] Not all conditional sales may automatically be deemed mortgages. On occasion, a repurchase option may be truly intended by the parties, and if so, those conveyances are not deemed mortgages.  See Conway's Ex'rs and Devisees, 11 U.S. (7 Cranch) 218 at 236– 37.

to be decided from all the circumstances.").

Christopher contends that, under Georgia law, a transaction cannot be deemed a mortgage unless it creates a creditor-debtor relationship between the parties – that absent a right to recourse by the purported lender against the purported debtor, the conveyance is what it is on its face, a conditional sale. Historically, the explicit creation of a creditor-debtor relationship, while an important factor to be considered, has not been dispositive. See Conway's Ex'rs and Devisees, 11 U.S. (7 Cranch) at 237. Christopher argues that the Georgia Supreme Court identified the explicit creation of such a relationship as a requirement for a conveyance to be construed as a mortgage in Haire v. Cook, 229 S.E.2d 436 (Ga. 1976), and Tingle v. Tingle, 179 S.E.2d 51 (Ga. 1971).

It is true that both Haire, and Tingle place great weight on the purported lender's lack of recourse against the purported debtor, and both cases contain language that supports Christopher's contention. See Haire, 229 S. E. 2d at 439 ("[T]here is no evidence that the grantee had the right to demand repayment and no evidence that either plaintiff agreed to be obligated to repay the debt. . . . Thus the deed cannot be considered to be a mortgage."); Tingle, 179 S. E. 2d at 55 ("For a security transaction to exist there must be the relationship of debtor and creditor.") We agree, however, with the distinctions pointed out by the district

9

court in affirming the bankruptcy court's decision. In neither <u>Tingle</u> nor <u>Haire</u> did the supreme court fully consider all the circumstances surrounding the transaction, as required by <u>Spence</u>. Instead, both courts looked only to the face of the conveyances and finding no indication of an intent to create a mortgage there, the courts concluded that the transactions in question were sales. Also, in both <u>Haire</u> and <u>Tingle</u>, there was not, as there is here, a great disparity between the consideration paid for the property and the property's value.

As the bankruptcy court noted, "reliance on [a recourse obligation] as a defining element of a loan transaction overlooks the fact that numerous secured real estate loan transactions are nonrecourse loans[.]" Express creation of a recourse obligation – or the absence thereof – is undoubtedly an important factor to consider, but it cannot not the determinative factor. Instead, a court must look at the intent of the parties in light of <u>all</u> the circumstances surrounding the transaction. <u>Spence</u>, 49 Ga. at 139.

We conclude that the bankruptcy court properly held, and the district court properly affirmed, that parties may create a mortgage although the instruments they use suggest that a conveyance of title rather than the creation of a lien. A lien may be created even when there is no provision for the payment of the debt. Having reached this conclusion, we now consider whether the bankruptcy court

clearly erred in finding that Christopher and Cox intended a mortgage.

### III.

Whether Cox and Christopher intended to create a mortgage is a question of fact. Spence v. Steadman, 49 Ga. 133, 139 (Ga. 1873). In finding that they intended the transaction to create a mortgage, the bankruptcy court relied on numerous subsidiary facts established at the adversarial hearing. Perhaps the most powerful among these was the value of the Cox tract at the time of the February 16, 2000 closing as compared to the value of the consideration paid by Christopher. At the closing, Christopher received title – subject to Cox's repurchase option – to a tract that had been valued three months earlier at nearly $2.5 million. Christopher assumed the outstanding AgSouth mortgage, which had an unpaid principal balance of around $700,000, and paid Banks $500,000 for Banks's share of the property's equity. Christopher did not make any payment to Cox for his share of that equity. In other words, Christopher received title to the Cox tract in exchange for consideration equal to about half the property's value: $1.2 versus $2.5 million.

A gross disparity between the sale price and the actual value of the land is evidence of the parties' intent to create a security interest – a mortgage – rather than a sale. See Russell v. Southard, 53 U.S. (12 How.) 139, 147–48, 13 L. Ed.

11

927 (1851) (holding that extraneous evidence is admissible to inform courts of all material facts surrounding the delivery of the deed, and concluding that "it is of great importance to inquire whether the consideration was adequate to induce a sale"); Conway's Ex'rs and Devisees, 11 U.S. at 241 ("A conditional sale . . . at a price bearing no proportion to the value of the property would bring suspicion on the whole transaction. The excessive inadequacy of price would, in itself, in the opinion of some of the judges, furnish irresistible proof that a sale could not have been intended."); Monroe v. Foster, 49 Ga. 514, 519 (Ga. 1873). In Russell, for example, the Supreme Court found that the consideration paid as part of the absolute deed transaction – less than $5,000 for land valued at several thousand dollars more – was "grossly inadequate" in that "there was no real proportion between the alleged price and the value of the property said to have been sold." Russell, 53 U.S. at 149. Similarly, in this case the consideration paid for the Ranch – scarcely half its actual value – was grossly inadequate, indicating that a sale was not really intended.

The absence of proportionality between the property's value and the consideration Christopher paid is not the only factor the bankruptcy court relied on to find that the parties intended to create a mortgage. The court also noted that Christopher and Cox did not negotiate the value of the property. The price was set

12

by the amount Cox required under his buy-sell agreement with Banks. Christopher paid the exact amount Cox needed to avoid being compelled to sell the Ranch. The absence of negotiations, coupled with the congruence between the price paid and the amount Cox needed to remain on the Ranch, indicate that Christopher intended the money he provided as a loan to Cox and not as the purchase price for the tract.

Likewise, the terms of the repurchase option indicate that the parties intended the transaction to create a mortgage. To exercise his option to re-purchase the tract, Cox had to pay Christopher a $100,000 "kicker" and interest at 9.25% on Christopher's total initial outlay. These terms, in the bankruptcy court's view, indicated that Christopher viewed the transaction as an investment opportunity – a loan.

In its order affirming the bankruptcy court's decision, the district court noted an additional factor supporting the finding that Christopher and Cox intended to create a mortgage. Following the closing, Cox continued to occupy the Ranch – and pay the real estate taxes and the insurance premiums on the policies covering the property – without paying Christopher any rent. Thus, Christopher and Cox continued to act as though Cox owned the property.

In light of the foregoing facts, the bankruptcy court's finding that

Christopher and Cox intended to create a mortgage was not clearly erroneous. The district court's decision upholding the bankruptcy court's determination is therefore

**AFFIRMED.**