## Allegheny Railroad and Coal Company *versus* Casey *et al.*

1. August 20th 1796, Wilson, in consideration of debts owing to Morgan and 10*l*., granted to Morgan in fee all his estate, &c., in lands to which he had a legal claim in Huntingdon and Northampton counties, &c., in trust, that Morgan in four months after Wilson should furnish him the drafts, evidences of title, &c., should select such part as at a value fixed by them, or in case of disagreement by Morgan alone, would be double the debt, and in thirty days after notice of the valuation, upon Wilson paying the debts and expenses, &c., should reconvey the land to him ; if he should not so pay, Morgan to reconvey to him all the lands not selected, and also in three months after the selected lands should be patented should reconvey such part as Morgan should see fit, or as at the valuation should remain after satisfying the debts, &c., Wilson to execute further assurances, &c., of the quantity retained by Morgan. *Held*, not a security for payment, but a mode of making satisfaction ; as to the surplus land, if any, it was of the nature of a mortgage.

2. The deed conveyed all the lands to Morgan if necessary to satisfy the debts, the reconveyance to be dependent on their payment.

3. The provision for reconveyance of the selected lands on repayment of the debts in thirty days was a provision for the protection of Wilson against an under valuation by Morgan.

4. There is no provision of law or equity which prevents one from conveying land in satisfaction of a debt.

5. Spering's Appeal, 10 P. F. Smith 210 ; Stoever *v.* Stoever, 9 S. & R. 446, followed.

May 22d 1875.    Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the Court of Common Pleas of *Blair county:* Of May Term 1875, No. 79.

This was an action of ejectment, brought February 17th 1874, by Joseph Casey, Cecilia D. Forsyth, Jacob Ziegler, John C. Heylman, Edward L. Bodin, and Forbes Holton, against the Allegheny Railroad and Coal Company. It was for a tract of land in Antis township, Blair county, formerly Huntingdon county, containing 433 acres 153 perches and allowance, warranted December 26th 1793, and surveyed in the name of Henry Boreland. The tract was one of 117, known as the "Richardson surveys," each tract containing the same quantity of land, the purchase-money of the whole having been paid to the Commonwealth by Judge James Wilson, August 18th 1794. Judge Wilson owned besides large quantities of land in Huntingdon and Northampton counties. Judge Wilson died intestate in August 1798, leaving two children, Bird Wilson and Mary Wilson, afterwards married to Paschal Hollingsworth ; these were his only heirs. The Hollingsworths, husband and wife, died long since, leaving an only daughter, Emily Hollingsworth, to whom Bird Wilson, on the 6th of March 1858, conveyed all his right, title and interest in his

[Allegheny Railroad & Coal Co. *v.* Casey.]

father's estate, for the consideration of $1.     June 16th 1858, Miss Hollingsworth conveyed to Charles A. Snyder in fee 175 tracts in Blair, Cambria and Clearfield counties, each containing 433 acres 153 perches of land; amongst these tracts were the 117 Richardson surveys, including the tract in dispute; through Snyder this title was vested in the plaintiffs.

On the 20th of August 1796, Judge Wilson made a deed to Benjamin R. Morgan, by which, in consideration of debts due by him to Morgan and Henry Lee, of Virginia, Wilson conveyed to Morgan all his estate in all the lands held by him in Northampton and Huntingdon counties, for the payment of debts mentioned in the deed; the deed also was in trust to re-convey certain portions of the land upon certain contingencies.     Morgan, and his representatives after his death, conveyed the land to divers persons absolutely, and the title thus conveyed is vested in the defendants. The plaintiffs contended that the deed from Judge Wilson to Morgan was but a mortgage, and that as Morgan or his representatives never took any steps to foreclose it, nor took possession of the land, after so great a lapse of time, the debts were presumed to be paid, and the title re-vested in the successors of Wilson. The defendants contended that the deed conveyed the land in satisfaction of the debts; or if it were a mortgage, the land being wild, unseated land, the mortgagee by payment of taxes and other acts of ownership had such possession of it for more than twenty-one years, as barred the equity of redemption.     The latter view was taken by the court below, and a verdict was rendered for the defendants.

The case was tried, February 2d 1875, before Dean, P. J.

The plaintiffs gave in evidence the facts in the foregoing statement, showing their title.

Under objection and exception, the defendants gave in evidence the deed of August 20th 1796, from Wilson to Morgan, by which the grantor, " for and in consideration as well of certain debts due and becoming due from the said James to Henry Lee, Esquire, of Westmoreland, in the state of Virginia, and the said Benjamin, as for ten pounds by the said Benjamin to the said James paid, the receipt, &c., * * * granted * * * unto the said Benjamin R. Morgan, his heirs and assigns for ever, all the lands, tenements and hereditaments, rights, properties and demands of the said James, together with all his estate, right, title and interest of, in, to and out of all and every the lands held by or to which the said James has a legal claim, within the counties of Northampton and Huntingdon, his estate at and contiguous to Wilsonville, containing about one hundred and fifty thousand acres, only excepted; to have and to hold the same to him, the said Benjamin, his heirs and assigns for ever, under the special trust, confidence following; that is to say, he, the said Benjamin, shall within four months after.

the said James shall have furnished to him the requisite papers, descriptions, drafts and evidences of title respecting the said lands, select therefrom such part as at a reasonable price to be agreed on between the said James and Benjamin, will amount to double the value of the whole of the debts then existing from the said James to the said Henry and Benjamin, but if they cannot agree in a valuation of the said lands, then the same shall be estimated at such a price as shall have been fixed by the said Benjamin, provided that the said James shall, at any time within thirty days after being notified of the valuation made by the said Benjamin, be entitled to a reconveyance of all the lands hereby granted, on his paying and satisfying to the said Benjamin the whole amount of the debts then existing from him to the said Henry and Benjamin, and the expenses incurred by them in selecting and conveying the lands hereinbefore mentioned; but if the said James shall not pay the amount of the existing debts then due to the said Henry and Benjamin within the time above mentioned, then the said Benjamin shall reconvey to the said James all the said lands, excepting the quantity so as aforesaid selected, and shall in like manner reconvey to him within three months after patents shall have been obtained for the quantity so selected, such part thereof as he, the said Benjamin, may think fit, as at the said valuation shall remain after satisfying all the debts of the said James to the said Henry and Benjamin, and all the necessary expenses of making such selection and completing the title and conveyances respecting the same, he, the said James, at the same time executing such further deed, contract, or warranty as may by the said Benjamin be requested respecting the quantity so as aforesaid retained by him.

"I agree that such debts as are due or accruing from me to George K. Taylor, of Virginia, Esquire, not exceeding 50,000 dollars, be included in the within contract, posterior, however, to the right of General Lee and B. R. Morgan.

"6th August 1796.                          JAMES WILSON."

This deed was recorded in the office of the recorder of deeds of Huntingdon county, September 14th 1796.

Also, under objection and exception—for the purpose of showing what lands Judge Wilson had in Blair county—the warrants and surveys of the "Richardson surveys," including the land in dispute; each survey being 433 acres and 153 perches; the warrants being dated December 26th 1793, and the surveys November 4th 1794; also, applications, warrants and surveys for a number of other tracts of land, the warrants dated respectively at various times from February 1st 1794, till June 6th 1794, and being in twelve batches, viz.: 1. The Chambers, in Union and Cass townships, Huntingdon county. 2. The McNutt, in Juniata and Penn townships, same county. 3. The John McNutt, in Penn, Lincoln, Cass and Todd townships, same county. 4. Another John McNutt,

[Allegheny Railroad & Coal Co. *v.* Casey.]

in Morris township, same county, and Catharine and Tyrone townships, Blair county.   5. Another Chambers, in Penn township, Huntingdon county.   6. The Turner, in Barre and Jackson townships, Huntingdon county, and in Clearfield and Centre counties. 7. The Russell, in Barre, Jackson and Brady townships, Huntingdon county.   8. The Prough, in Porter, Walker, Penn and Hopewell townships, Huntingdon county, and South-eastern township, Blair county.   9. The Green, in West and Barre townships, Huntingdon county.   10. The Galbraith, in Shirley township, Huntingdon county.   11. Another Galbraith, in Tell and Cromwell townships, same county.   12. Other warrants in Shirley and Cromwell townships, same county; the purchase-money having been paid by Judge Wilson.

Defendants gave in evidence a deed dated October 10th 1800, from Morgan to John Warder.   It recited conveyance January 27th 1794, by Daniel Turner to Wilson, of forty-nine tracts, unlocated, in Huntingdon county, and the said tracts, except three, were duly returned ; the whole containing 19,071 acres and 11 perches.   It further recited, that Wilson, on the 20th of August 1796, conveyed to Morgan, " his heirs and assigns for ever. all the lands, &c., of him, the said (Wilson), with all his estate, right, &c., of all the lands held by or to which he, the said (Wilson) had a claim within the counties of Northampton and Huntingdon," &c. It further recited, that the forty-six tracts were in pursuance of an agreement of Morgan, exposed to sale at public auction, the purchaser to receive such title as Morgan could give under Wilson's conveyance, and sold them to Warder for $620, and for that consideration conveyed the tract to him.

They gave in evidence deed dated September 24th 1834, Morgan to John Savage, reciting the conveyance of August 20th 1796, from Wilson to Morgan ; and that " the said lands, at a valuation made in pursuance of the provisions and conditions contained in the said indenture, have proved insufficient to satisfy the debts therein mentioned, and become absolutely and unconditionally vested in the said Benjamin in fee simple," and for $4000 conveyed all Morgan's estate, &c., in a number of tracts, specifying them by the names of warrantees, date of warrants and surveys, &c., to Savage.   They gave in evidence also the two following papers received by J. S. Africa, the present owner of the Savage lands, with the title-papers of those lands when conveyed to him, viz. : one headed, "valuation of lands in Huntingdon county, Pennsylvania, purchased in the following lots and from persons whose names are subjoined, by Judge Wilson."   Then follow the names of the persons, being the "Richardson" and others before stated, with a valuation to each, aggregating $58,941.66, to which is appended:

" I acknowledge that I have received a copy of the above list and valuation for my father.                    BIRD WILSON. March 21st 1797."

[Allegheny Railroad & Coal Co. *v.* Casey.]

The other headed: "Division of lands between General Lee and Benjamin R. Morgan." Then follow a statement of lands in Northampton county, and statement of lands in Huntingdon county, those in Huntingdon being three of the batches mentioned in the foregoing valuation, and at the valuations then fixed, the aggregate valuation was $46,041.83. To this was appended:

"March 6th 1798, a division nearly equal as conveniently could be effected having been made, and lots drawn to determine which part of certain lands conveyed by James Wilson, Esquire, to Benjamin R. Morgan, should be for his own use, and which for the use of General Henry Lee, the moiety included in the within list was drawn by me for the said Henry Lee.          P. BUTLER,

BENJN. R. MORGAN."

It was endorsed: "Lands drawn by lot by Pierce Butler, Esq., March 6th 1798, on behalf of General Lee, on a division made to enable Mr. Butler to pursue the general's property separate from B. R. Morgan.

"Mem. This was by consent of General Lee, but he and B. R. Morgan made division as to themselves afterwards."

They gave in evidence thirty-seven deeds from Morgan for lands formerly of Wilson, in Huntingdon county, to various persons, dated respectively from 1811 to 1839.

They gave in evidence the will of Morgan, proved the 3d of December 1840, by which he authorized his executors to sell all his undevised real estate. He appointed Lewis Waln, Coleman Fisher and William Rawle, his executors.

The defendants gave in evidence deeds from the executors of Morgan to various persons for tracts of land in Huntingdon county.

John Kratzer testified that he took possession of some of the tracts, amongst others that in dispute, about the year 1830, opened a coal-bank, erected saw-mills, cut timber and made lumber on them, before he knew who owned them, and afterwards purchased them and twenty-nine other tracts from the attorney in fact of the executors of Morgan by articles of agreement; he paid taxes on part of them; while in possession of them no one on behalf of Judge Wilson made any claim on him for them; the interest of the witness was sold by the sheriff to William Lloyd and others, and a deed made by the executors of Morgan about 1846 to them; they in 1853 conveyed the lands to the defendants.

They gave in evidence a deed, January 28th 1854, for sixteen tracts of the "Richardson" land from the executors of Morgan to John Cresswell, Jr., and conveyance by him to defendants, May 20th 1854. They gave evidence that Thomas Jackson was agent of Morgan and his executors from 1838 up to about 1853; he had the land surveyed, and took general care of them; after Jackson's death his son took charge of them, settled with the executors of

[Allegheny Railroad & Coal Co. *v.* Casey.]

Morgan for the proceeds of sales made by his father, and paid them; during all the time no claim was made on behalf of the heirs of Wilson. They gave evidence that buildings for iron-works were put up on the Savage purchase long before 1847, and an agent of Savage was living on them; J. S. Africa afterwards became owner of these lands; no claim was ever made on him by the Wilson heirs.

There was evidence that the trustees of the Savage estate had charge of his land in Huntingdon county from 1842 to 1858; that they went to see Dr. Bird Wilson, son of Judge Wilson, in 1852, to ascertain if he had any claim as heir of Judge Wilson to any of the lands mentioned in Judge Wilson's deed to Morgan, and if so to get him to release his claim; Dr. Wilson said he had no claim to transfer; he considered the deed a perfect transfer of the property; his father had always considered it so. They gave in evidence the account of the executors of Morgan, showing pay-ments by Jackson to them for sales of "mountain land near Holli-daysburg, for 107 tracts, to which B. R. Morgan was supposed to have a title," &c.

They gave in evidence charges in the "Land Ledgers of Hun-tingdon county," showing entries headed:—

"Dr. Benjamin R. Morgan, Esq., of Philadelphia.

"The following tracts, formerly the property of Judge Wilson, now B. R. Morgan."

Also, a number of other tax records, showing assessments and payment of the taxes on these lands by Morgan and his represent-atives and successors from 1799.

There was a large amount of evidence for the purpose of show-ing such acts of ownership by Morgan and his representatives as were consistent with the character of the land.

The evidence showed that the last of these lands were sold by Morgan's executors about 1854. On the 28th of January of that year the executors conveyed eight of the "Richardson tracts" to Paul P. Keller. This deed recited that Morgan by his will directed his executors to sell the residue of his real estate, and that "a certain large body of lands situate in Blair and Cambria and Clearfield counties, known as the ' Richardson surveys,' and con-taining originally 117 tracts, form a part of the said residue." The deed then specified the tracts by the warrantee names, and recited "that they were a part of a large body of lands containing 117 tracts above mentioned, which became duly vested in the said Ben-jamin R. Morgan in his lifetime."

Keller, on the 9th of September of the same year, conveyed forty-five of these tracts, including that in dispute, to the defendants, for the consideration of $14,000. All the deeds were duly recorded about the time of their date.

The plaintiffs in rebuttal gave evidence, that the Turner, Mc-

Nutt and Chambers surveys were patented in 1801, 1805 and 1806 ; and that none of the Richardson surveys except three were patented up to June 30th 1874.

Both parties submitted points, which were denied, except two by the plaintiffs, which asserted that the deed of August 20th 1796 was not an absolute conveyance, but a mortgage ; and one by defendants, which asserted that if the deed were a mortgage, the undisputed evidence showed that Morgan and his successors had been in possession, and the plaintiff's right to redeem was lost by lapse of time.

These three points were affirmed.

The court charged, amongst other things, as follows :— * * *

" The right of the parties to the possession now will depend on the construction to be given to the instrument of 20th of August 1796, and the course of conduct of the parties to that instrument, or of their privies, with reference to the subject-matter of that contract.    What is the character of this instrument ?  If it be a conveyance in satisfaction of debts due from Wilson to Morgan and Lee, the debts, in the contemplation and in the understanding of the parties, extinguished by this conveyance, the right to re-purchase at a future time reserved to Wilson in the deed would not make it a mortgage.    Morgan's title would have been abso-lute from the date of the instrument, and the right to the patent from the Commonwealth would follow.    But this is not such a deed as is here claimed by the defendant. * * * There is nothing in the instrument, nothing in the circumstances surrounding the making of it, which indicates that Morgan wished to purchase lands, or that Wilson desired to sell to him lands.    The parties were not treating about or contracting concerning any quantity of lands, their location or the character or value of them either for present purposes or for future speculations.    They were treating of and contracting about debts due or becoming due from Wilson to Morgan and Lee; and the obvious intention of both of them was that this indebtedness should be secured by a pledge of Wilson's lands until the indebtedness should be paid, either by a future con-veyance of a portion of the land, or by payment of the debt in money by Wilson at a future period. * * * If this be the mean-ing, * * * it is a mortgage, and we so hold it to be a mortgage. * * * Morgan had a paper which gave him the use of the legal estate for the purpose of collecting his debt out of the land.

" If then, by the instrument itself, no estate in the land and no right to the possession passed to Morgan, has he now, or those claiming under him, after the lapse of almost eighty years, shown by the evidence anything which will warrant you in rendering a verdict sustaining the right of the defendants to the possession of the tract described in the writ ?    We hold that the parties to such an instrument as this, and those claiming under them, may, by

[Allegheny Railroad & Coal Co. *v.* Casey.]

their conduct, by unequivocal acts, for a long period of time, warrant you in presuming that the entire estate has become vested in the mortgagee, when by the instrument itself he had no estate in the land. * * *

" From the year 1800 down every act of Morgan, and of those representing him, was in assertion of an absolute title to, and the right to the possession of, these lands. These acts were not few; they were not at distant or fitful intervals; they were not equivocal; they were numerous—the payment of taxes; the surveying of lands; the selling them time after time; guarding them from trespassers; employing agents to take charge of them. They were kept up, following year after year with unbroken continuity from 1800. They asserted with unmistakable significance a claim of absolute ownership, to the exclusion of every man and the right of every one. During all this time we look in vain for a single act of those on whom devolved the legal title, indicating a claim on their part or a denial of Morgan's right.

" On the contrary, the evidence, if it be believed, on the part of one witness, concerning the declarations of the son of Judge Wilson, indicates that with a knowledge of his father's right, not ignorant of the instrument, more than fifty years after it was made, he concurs in the claim of Morgan, and disavows any claim on the part of himself or those who had a right to claim under his father.

" The plaintiffs here, on titles acquired from the descendants of Judge Wilson within the last five years, now do assert his rights as a mortgagor, and they ask us to say to you that nothing short of actual possession for a period of twenty-one years by the mortgagee will warrant the presumption that the equity of redemption on the part of Wilson has been released; that these being unseated lands not in the actual possession of Morgan, he cannot be treated as in possession, but that the real possession was in the true owner during all this time, *i. e.*, Wilson or those claiming under him by descent or otherwise, having his title. We do not so hold the law to be as applied to the facts in this case. If by actual possession is meant a personal residence upon the lands and personal occupation of them, we hold that that is not the law in Pennsylvania.

" On the contrary, we hold that these being unseated lands, not in the actual personal occupancy of anybody (nor could they be while unseated, unimproved, and wild), if the mortgagee, Morgan, and those under him from 1800 down, had such possession as the nature of the property claimed admitted of; if by continuous, notorious, and unequivocal acts he asserted his right to the actual possession, took just such possession as he could take, and held them as unseated lands, in the absence of any assertion of right on the part of Wilson or those claiming under him in denial of Morgan's right, the law will presume, after this lapse of time, that

the right to redeem has been relinquished by Wilson, the owner, and those claiming under him, and that the entire estate has become vested in the mortgagee. The evidence in the case is uncontradicted as to these facts, and we instruct you to render a verdict for the defendants."

The verdict was for the defendants.

The plaintiffs took a writ of error. They assigned thirty-four errors :—

1–12. Were to the rulings of the court on questions of evidence. 13–18. The charge of the court. 19–34. The answers to the points. The construction of the deed of 1796 being the question considered and decided by the Supreme Court, it is not necessary to particularize the errors assigned.

*B. P. Wilson* and *W. Mac Veagh* (with whom were *F. H. Cheyney* and *R. B. Petriken*), for plaintiffs in error.—Title by warrant and survey returned and accepted and purchase-money paid, is the complete equitable title and the complete legal title, against all but the Commonwealth. Of such title no abandonment can be presumed or established : Willis *v.* Bucher, 2 Binn. 465 ; Cox *v.* Cromwell, 3 Id. 114 ; Davis *v.* Keefer, 4 Id. 166 ; Duer *v.* Boyd, 1 S. & R. 203 ; McCoy *v.* Dickinson College, 4 Id. 305 ; Urket *v.* Coryell, 5 W. & S. 83 ; Hoey *v.* Furman, 1 Barr 295 ; Lineweaver *v.* Crawford, 2 Cas. 451 ; Fox *v.* Lyon, 3 Id. 16 ; Washabaugh *v.* Entriken, 10 Id. 78 ; Hoffman *v.* Bell, 11 P. F. Smith 444 ; Watson *v.* Gilday, 11 S. & R. 337. Abandonment can be set up only by the Commonwealth : McCall *v.* Anchors, 2 Harris 257. The instrument of August 1876 is but an executory contract. Under the Statute of Frauds there can be no specific execution of a contract in respect to lands, unless the parties have described and identified the particular tract which is to pass, or unless the contract furnishes the means of certain identification of the lands to be conveyed : 1 Sugden on Vendors 134, note *o ;* 135, note *z ;* Blagden *v.* Bradbear, 12 Ves. 466 ; Reed *v.* Hornback, 4 J. J. Marsh. 377. And parol evidence is not admissible to supply the omission : Wilkinson *v.* Davis's Adm's, Freeman's Ch. Rep. 58 ; Holme *v.* Strautman, 35 Mo. 299 ; Robeson *v.* Lewis, 64 N. C. 736 ; Carter *v.* Barnes, 26 Ill. 454 ; Boyd *v.* Ellis, 11 Iowa 101 ; Worthington *v.* Hylyer, 4 Mass. 205 ; Messick *v.* Sunderland, 6 Cal. 308. Vague description, which will not indicate the locality of land or afford the means of finding it, is not notice to a subsequent purchaser : Lodge *v.* Simonton, 2 Penna. R. 444 ; Bank *v.* Ammon, 3 Casey 175. The instrument was at the most an executory contract, and therefore neither transferred nor vested at law any present title. Such change requires an actual conveyance by deed : Lau *v.* Mumma, 7 Wright 267 ; 1 Hilliard on Contracts 49 ; Stouffer *v.* Coleman, 1 Yeates 393 ; Campbell *v.*

Sproat, Id. 328 ; Neave *v.* Jenkins, 2 Id. 108 ; Sherman *v.* Dill, 4 Id. 297 ; Stokely *v.* Trout, 3 Watts 163 ; Williams *v.* Bentley, 3 Casey 300 ; Stewart *v.* Long, 1 Wright 203 ; Bruner's Appeal, 7 P. F. Smith 53.   In determining whether a contract is executed or executory, the first rule is to inquire whether collecting all its parts, it contemplates a further assurance to pass the title : Bortz *v.* Bortz, 12 Wright 385 ; Garver *v.* McNulty, 3 Id. 484 ; Gray *v.* Packer, 4 W. & S. 18 ; Ogden *v.* Brown, 9 Casey 249.   Abandonment of a contract may be presumed where there is considerable lapse of time between the execution of the contract and the delivery of the deed, where no act is done towards completing the sale by the purchaser : Bellas *v.* Hays, 5 S. & R. 443 ; Sugden on Vendors 404, note *y.*   Morgan not having complied with the agreement, it cannot now be completed, because those standing in his place are barred of their right by lapse of time, and because of the presumption of payment of the debts after twenty years, and because the agreement conferred certain powers of selection and valuation upon Morgan, which were personal to him, and cannot be exercised by any other : 1 Sugden on Powers 334 ; Hill on Trustees 489 ; Cole *v.* Wade, 16 Ves. 44 ; Down *v.* Worrall, 1 M. & K. 561 ; Edelman *v.* Yeakel, 3. Casey 26 ; Cox *v.* Freedley, 9 Id. 130 ; Stoever *v.* Stoever, 9 S. & R. 447.   An absolute deed, with an agreement to reconvey on payment of a sum of money, is a mortgage, although there be no covenant for payment of the money : Wharf *v.* Howell, 5 Binn. 499 ; Wheeland *v.* Swartz, 1 Yeates 582 ; Stoever *v.* Stoever, 9 S. & R. 447 ; Kerr *v.* Gilmore, 6 Watts 407 ; Spering's Appeal, 10 P. F. Smith 210 ; Harper's Appeal, 14 Id. 317 ; Danzeisen's Appeal, 23 Id. 70.   The instrument does not give notice of any amount, class or description of indebtedness which it is intended to secure, and the record would be no notice of encumbrances on the property of James Wilson.   The object of the recording acts is to compel those who claim a priority of lien or conveyance to place the true nature of the transaction on record : Jacques *v.* Weeks, 7 Watts 268 ; Pettibone *v.* Griswold, 4 Conn. 161 ; Stoughton *v.* Pasco, 5 Id. 446.   A mere constructive possession by a mortgagee is not enough to bar the mortgagor. Nothing short of actual possession by mortgagee for twenty-one years will at law toll the entry of the true owner ; the equity of redemption, which in this court is the same as the fee at law, ought to be equally protected : Moore *v.* Cable, 1 Johns. Ch. 386 ; Knowlton *v.* Walker, 13 Wis. 269 ; Robinson *v.* Russell, 24 Cal. 472 ; Procter *v.* Cowper, 2 Verm. 376 ; Robinson *v.* Fife, 3 Ohio N. S. 560.   Payment of taxes gives no right : Hockenbury *v.* Snyder, 2 W. & S. 252 ; Urket *v.* Coryell, 5 Id. 83 ; Quin *v.* Brady, 8 Id. 140 ; Grant *v.* Levan, 4 Barr 427 ; Strimpfler *v.* Roberts, 6 Harris 300.   The mere cutting of timber on woodland occasionally, without residence on it, will not constitute an ouster

as to such woodland: Peck *v.* Ward, 6 Harris 508; Raush *v.* Miller, 12 Id. 280.

*S. S. Blair*, for defendants in error.—When it becomes a question whether a deed is a mortgage, or contains only a provision for a repurchase by the vendor, it is one purely of intention, to be determined as well by the instrument itself as by the aid of extrinsic circumstances: Stoever *v.* Stoever, 9 S. & R. 446; Conway *v.* Alexander, 7 Cranch 218. If there be no loan of money on security, and the intention of the transaction is to make a sale, no rule of law will prevent this: Spering's Appeal, 10 P. F. Smith 210; Harper's Appeal, 14 Id. 320. When the conveyance is made in satisfaction of a precedent debt it cannot take effect as a mortgage, although containing a clause of redemption, for the previous debt being extinguished, and no new one created, one of the essential attributes of a mortgage is wanting: Poindexter *v.* McCarman, 2 Dev. Eq. 273; McKinstry *v.* Conly, 12 Ala. 678; Robinson *v.* Cropsy, 2 Ed. Ch. 138; 6 Paige 480; 2 White & Tudor's Lead. Cas. in Eq., pt. 2, 439; Todd *v.* Campbell, 8 Casey 254. That all the title papers were to go into the hands of Morgan, is a strong proof that seisin was intended to pass: Guthrie *v.* Kahle, 10 Wright 331. There being no personal covenant of the grantor to pay the money in defeasance of the estate granted, is, with other circumstances, proof that it was but a provision for repurchase. In this case the absence of such covenant is peculiarly significant, as it is in harmony with the whole scheme of satisfying the debts by payment in land: Floyer *v.* Lavington, 1 P. Wms. 272; Butler's note, Coke Lit. 205 a. It appears that a valuation was made in Judge Wilson's lifetime of the Huntingdon county lands; that much has been rescued from the spoils of time, and it does not appear that they were sufficient for the payment of the debts. We may fairly presume the Northampton lands were also valued, and that there was no surplus. A court of equity, after a great length of time, will presume some act to have been done, which, if done, is a bar to the demand: Lewin on Trusts 735. The lands remaining at Morgan's death have all been sold by his executors, and have, with those he sold in his lifetime, gone into the hands of hundreds of purchasers, who have kept up their possessions in the same way. This is possession in Pennsylvania: Guthrie *v.* Kahle, 10 Wright 331; Todd *v.* Campbell, 8 Casey 254; Butler's note, Coke Lit. 205 a. Where the relation of trustee and cestui que trust is not admitted to exist, or time and long acquiescence have obscured the nature and character of the trust, or the acts of the parties, or other circumstances give rise to presumptions unfavorable to its continuance, in all such cases a court of equity will refuse relief upon the ground of lapse of time and its inability to do complete

justice: Story Eq. Jur., sec. 1520, sec. 64 a; Brock *v.* Savage, 7 Casey 421; 10 Wright 83.

Chief Justice AGNEW delivered the opinion of the court, October 12th 1875.

The argument of plaintiffs in error in this case is learned and able, and its general positions incontrovertible. But its point of failure to convince lies in the interpretation of the deed from James Wilson and wife to Benjamin R. Morgan, of the 20th of August 1796. This instrument has certain characteristics of a mortgage, yet it is not a mortgage purely. It is a conveyance in trust for the payment of certain debts of Judge Wilson, and for a re-conveyance of the *excess* only. Its principal intent is to make payment in lands, and its secondary intent is to return those lands only not necessary for this purpose. It is not a mere security for payment —but a mode of making actual satisfaction. As to the surplus land, if there should be any, it partakes of the nature of a mortgage. An analysis of the deed will exhibit this. The first part of the deed is a distinct and absolute conveyance of all Judge Wilson's lands in Northumberland and Huntingdon counties, except his estate of Wilsonville of about 150,000 acres. This mode of conveyance in gross of all his lands within these limits assists in understanding the remainder of the deed. It exhibits the fact that the parties were uninformed of the real extent and value of the property as a means of satisfying these debts, and therefore resorted to the mode adopted of providing for the subject. Hence, next follows an *express trust,* the terms of which are specifically stated. The first provision of this trust is, that Morgan shall, within four months after Wilson shall have furnished the requisite muniments of title, select therefrom such part of the lands at a reasonable price agreed upon between them, or, if they cannot agree, at a valuation made by Morgan, as will amount to double the value of the whole of the debts then existing. Several matters are noticeable in connection with this provision. First, it contemplated a full delivery of the title-papers to Morgan, a feature not common in the case of a simple mortgage, in which no beneficial estate passes: Guthrie *v.* Kahle, 10 Wright 331. This connects itself with the subsequent provision evidencing that Morgan himself was to take out the patents. The next noticeable matter is, that it distinctly grants to Morgan a right to select the lands intended to be appropriated to the debts. The last matter is, that the provision necessarily involved the right on the part of Morgan to take all the lands conveyed, if, at the valuation, all shall be found necessary to pay the debts. The parties thought there might, or even would be an excess, but this was clearly unknown, while the deed conveyed all, and carried the right to all, if necessary to carry out the main intent, viz.: satisfaction of the debts, so that the re-conveyance was evidently dependent on the fact of there

being an excess. After this provision came that which it is argued gives to the instrument the character of a mortgage. It provides that Wilson shall, within thirty days after notice of the valuation made by Morgan, be entitled to a re-conveyance of all the lands granted, on payment of the whole of the then existing debts, and the expenses incurred in selecting and conveying the lands. If this provision stood alone, as the final conclusion of the parties, it would be difficult to resist the inference that the instrument was simply a mortgage. But it is followed by inconsistent provisions, which, in connection with what had preceded, prove that this was not the main intent, but that it was a provision intended for the protection of Wilson against an undervaluation by Morgan—a sort of *locus penitentiæ* to preserve his interests. But if Wilson failed for thirty days to pay the whole amount of the existing debts, then Morgan should re-convey to Wilson all the lands *except the quantity so selected.* Now as to the lands selected, it is clear there was to be no re-conveyance, but they were to be held by Morgan as the means of paying the debts and expenses. Here we have a return to the first provision of the trust, to wit. : satisfaction, not security. These lands were not mortgaged, but were to be held by Morgan as the means of satisfaction. But as Morgan was allowed for his protection to select double the quantity of lands, which, at the valuation, would pay the debts and expenses, another provision became necessary for the protection of Wilson, viz. : that Morgan should re-convey all of the selected lands not required to pay the debts and expenses, making him the judge, however, of the lands he should retain, so that he should keep in his own hands what would, without doubt, enable him to satisfy the debts and expenses. The language is, "And shall in like manner re-convey to him within three months after patents shall have been obtained for the quantity so selected, such part thereof as he, the said Benjamin, may think fit, as at the said valuation shall remain after satisfying all the debts of the said James," &c. Then follows a provision for further assurance to Morgan for the lands so retained. The expression "after satisfying all the debts of the said James," and the clause for further assurance, evince the intent of the parties with great clearness, that whatever lands were found to be neces- sary to pay the debts and expenses were not to be re-conveyed, but were to be held by Morgan to fulfil the purpose of the deed, which was satisfaction of Wilson's debts. What might be called the mortgage clause of the instrument clearly did not apply to them, but applied only to the excess not required to fulfil the main pur- pose of the parties. Thus the deed was framed to protect the interests of both parties. But suppose it should turn out that the lands at the valuation were insufficient to pay the debts and ex- penses, what then ? And it must be remembered that expenses here was no unmeaning or trivial affair. The selection involved a thorough examination of hundreds of tracts of wild mountain land,

[Allegheny Railroad & Coal Co. *v.* Casey.]

in a region of country to a great extent uninhabited and unimproved. Surveyors, chain-carriers, and horses were to be hired, provisions and tents found, and all that a wild country required to subsist and shelter men, and besides all these expenses a patent fee of ten dollars for every tract. If, then, it took all the lands conveyed to pay the debts and expenses, it is clear the main intent of the deed was that all should go in satisfaction. Now unless we hold that parties are incompetent to deal with their own so as to answer their just and lawful purposes, we must declare that this deed contained a lawful and competent arrangement to afford satisfaction of Judge Wilson's debts. The parties dealt about a subject to a great extent unknown to them, and liable to unforeseen contingencies, and they made every provision in the deed which seemed to be necessary to protect the interests of each, and yet to result in what was their clear and main intent, to wit: to provide for payment of these debts in lands. Both law and equity will therefore sanction this intent. But if the real intent had been merely a pledge of land as a security for the debts, then " once a mortgage always a mortgage." This, however, means to protect the straitened debtor who needs the use of money, against a grasping creditor who would take advantage of his necessity. But there is no principle of law or equity which forbids a conveyance of land in satisfaction of a debt, and the fact that the nature of the subject requires various provisions to protect their mutual interests does not clash with this right. Such was the judgment of Justice Duncan, in Stoever *v.* Stoever, 9 S. & R. 446, and of Chief Justice Marshall, in Conway's Ex'rs. *v.* Alexander, 7 Cranch 218. The last case is a strong precedent. In Spering's Appeal, 10 P. F. Smith 210, it is decided that when the transaction is a sale for a fair price, and not a loan on security, it will be held valid as a sale, notwithstanding an agreement to reconvey within a limited time. In this case then there was nothing to forbid an arrangement by which as many lands should be taken in payment of Wilson's debts as should be found necessary for this purpose, and that those not so found necessary should be held in trust to be re-conveyed. They were dealing about an uncertain and, to a great extent, unknown subject—wild mountain lands—without a market value, and liable to a large expense to make them known, and to render them available. In considering the intent of the parties, a court will look at all the surrounding circumstances in a case like this, not giving too much weight to form, unless the writing on its face is clearly a mortgage, when the rule is not to receive parol evidence to contradict the writing: Wharf *v.* Howell, 5 Binn. 499; Stoever *v.* Stoever, *supra;* Kunkle *v.* Wolfersberger, 6 Watts 126; Kerr *v.* Gilmore, Id. 408; Hiester *v.* Madeira, 3 W. & S. 386; Wilson *v.* Shoenberger, 7 Casey 295; Todd *v.* Campbell, 8 Id. 250; Haines *v.* Thomson, 20 P. F. Smith 434; Sweetzer's Appeal, 21 Id. 264.

29 P. F. SMITH—7

[Allegheny Railroad & Coal Co. *v.* Casey.]

In the case of a deed absolute on its face, or where it is very doubtful, when the attempt is to convert it into a mortgage by extrinsic facts, it is evident that all the circumstances should be given their full weight, as well those in favor of the absolute character of the conveyance, as those of its defeasible. So far as the facts have come down to us in this ancient case, they concur in giving this deed the interpretation we have placed upon it. In the year 1796 these lands were unimproved, lay in large bodies, and were of little value—the mountain lands especially being wild and quite inaccessible. Market value they certainly had not. Judge Wilson was a land speculator of the most extensive kind, taking up the wild lands of the state by hundreds of thousands of acres. Wilson's speculations had run him largely in debt, leaving him without the means of payment, except in this unproductive property. From the nature of these lands, their situation and unproductiveness, the sparseness of population, and the very primitive condition of manufactures and commerce in 1796, it is very evident that Wilson himself knew little of the value of his property. Indeed, the terms of the deed very clearly lead to this belief. Hence, the deed was not for a defined quantity, but for all his lands in the two counties, and their value left to subsequent inquiry and estimate. For this purpose Morgan had four months after the delivery of the title-papers for selection, and additionally was to have double the valuation to cover the debts and expenses. That the parties afterwards found the lands inadequate to payment, and, in consequence, suffered all to fall under the absolute features of the deed, are deductions irresistibly arising upon the subsequent facts and the entire history of the case. Otherwise it would be impossible to account for the conduct, both of Wilson and his son, Bird Wilson, and of Morgan. The valuation of the lands in Huntingdon county, found among the papers delivered to Mr. Savage, upon his purchase of some of these lands from Morgan, is a strong circumstance to begin with. This paper is identified by Bird Wilson, on the 21st of March 1797, who subscribed thereupon his acknowledgment that he had received a copy for his father. How much more documentary evidence there may have been, it is impossible now, after the lapse of three-quarters of a century, to know; but this paper has survived the tooth of time, and gives form and consistency to the after facts.

Additionally, we learn that General Lee, the other creditor named in the deed, and Morgan divided the lands. As early as 1796 Morgan began to be assessed with the taxes upon them, as far assessments were made at that early time, when much of the wild mountain land escaped general assessment. In 1800, Morgan began to convey the lands to purchasers; continuing sales down to the time of his death in 1840, and after his death, his executor closed out the whole by sales. Throughout this time Morgan controlled all these lands, appointing agents to survey and take care of them,

[Allegheny Railroad & Coal Co. *v.* Casey.]

and to sell them, paying taxes when assessed to him, and doing all those acts which indicate the ownership and control of such lands; and such possession as from their nature they were susceptible of. During all this time, there was a corresponding dereliction of all claim, control, possession and attention to these lands on part of Judge Wilson and his heirs. Judge Wilson died in 1798, but his son Bird Wilson was a full-grown man, and must have been partially familiar with his affairs, Bird having died in 1859, at the age of eighty-two years. Judge Wilson left but two children, a son and a daughter. Bird, the son, not only abandoned, but disclaimed all interest and title in this property. His sister and her husband never claimed title, while her daughter, Miss Hollingsworth, evidently had no knowledge or belief of title in her grandfather. Bird Wilson, to enable her to sell a mere speculative claim, conveyed to her for the consideration of one dollar, while she conveyed all her interest in this vast domain, consisting of hundreds of thousands of acres, for the pitiful sum of $5000, of which she was to get but one-third, leaving the speculator who suggested and got up the sale to reap the profits of the other two-thirds. Without enumerating all the facts, or dwelling upon them, there was ample evidence justifying the presumption that the parties finding the lands insufficient for the payment of the debts of Judge Wilson, suffered all to fall within the absolute intent or feature of the deed. That Morgan so understood it, is proved by his averment in his deed to John Savage, made on 22d September 1834, in these words: "And whereas, said lands, at a valuation made in pursuance of the provisions and conditions contained in the said indenture (Wilson's deed), have proved insufficient to satisfy the debts therein enumerated, and become absolutely and unconditionally vested in the said Benjamin (Morgan) in fee simple." This recital is not evidence, *per se*, against the heirs of James Wilson, but as an allegation of the other party consistent with and supported by the facts, it has weight as a circumstance. It was an averment made while exercising control over these lands, and as a part of the *res gestæ* of the transaction, gave it character.

Therefore, as a just and indeed irresistible conclusion from all the facts that these lands have passed absolutely to Morgan by the very terms of his deed, and to answer its main intent, it becomes unnecessary to resort to a presumption of release or extinguishment of the equity of redemption, there being none; or to the bar of the Statute of Limitations. Hence, it is unnecessary to discuss the doctrine of constructive possession or the kind of possession necessary to give effect to the bar of the statute. The court below thought the deed was a mortgage, and used the facts referred to as a means of raising the presumption of a release of the equity of redemption. The result, however, is the same, as we

[Allegheny Railroad & Coal Co. *v.* Casey.]

view the deed, viz., as a trust for the payment of Wilson's debts, with a provision for the reconveyance of the *excess* only, and the facts relied on by the court below show that there was no excess, and that the lands conveyed passed under the absolute terms of the deed.                                    Judgment affirmed.